The **BENDIX CORPORATION**, a Delaware Corporation

v.

The **UNITED STATES**.

No. 78–71.

United States Court of Claims.

June 13, 1979.

Stanton T. Lawrence, Jr., New York City, attorney of record, for plaintiff; John E. Kidd, Pennie & Edmonds, B. G. Andrews, New York City, William F. Thornton, and William N. Antonis, of counsel.

Steven Kreiss, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Vito J. DiPietro, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

## OPINION

**PER CURIAM:**

This patent suit for compensation under 28 U.S.C. § 1498 (1976) concerns certain early fuel controls for jet engines and involves the alleged infringement of Mock Patent No. 2,581,275, issued January 1, 1952, hereinafter sometimes the '275 or the Mock patent, and of Kunz Patent No. 2,720,751, issued October 18, 1955 (the '751 or Kunz patent). The case was tried before former Trial Judge Cooper who issued his opinion and findings that (1) the claims of the '751 patent involved in this litigation were invalid, and (2) the involved claims of the '275 patent had been infringed. Defendant excepted to the determination that

the Mock patent (the '275 patent) had been infringed; plaintiff did not except to the determination that the claims in suit of the Kunz patent were invalid.

Oral argument was had before the above panel, after which the court issued an order (dated October 21, 1976) remanding the case to the Trial Division for a supplemental opinion, findings, and conclusion of law on an issue (bearing on the alleged infringement of the Mock patent) which the court believed had been sufficiently raised before Trial Judge Cooper but on which he had made no findings and which he did not discuss in his opinion.[1]

Trial Judge Browne, who succeeded Trial Judge Cooper, then issued his supplemental opinion, findings, and conclusion of law on the issue remanded in our order (see footnote 1, *supra*). Defendant has again excepted and the case has been argued on the remanded issue before the same panel (as provided in our order). In this opinion we dispose of the whole case—the issues discussed by Trial Judge Cooper and that treated by Trial Judge Browne.

We agree in general with the results reached by, and in largest part with the opinions of, both trial judges. This *per curiam* opinion is based upon both of their opinions, with some modifications, excisions, and supplementations. Part I, *infra*, deals

with the issues of validity and license raised, as to the Mock patent. In Part II, *infra*, we consider the issue of the infringement (by or on behalf of the Government) of the Mock patent. Finally, in Part III, *infra*, we adopt Trial Judge Cooper's opinion on the Kunz patent (to which plaintiff did not except).[2]

I

*Mock patent—issues other than infringement*

Jet engines operate by taking in a mass of air at the inlet of the engine and forcing it out the rear of the engine at an accelerated velocity to produce a reaction or propelling thrust. The basic components of a gas turbine engine are a compressor section (for pumping the air through the engine), a burner section (for heating the air to expand it and accelerate it), and a turbine section (which is driven by the accelerated air to drive the compressor). In general, the magnitude of the thrust generated by an engine depends upon the mass of air taken into the engine and the extent to which it can be accelerated and ejected.

At a constant speed and load, a gas turbine engine will require a fixed amount of fuel in proportion to the entering air but, during transient conditions, the engine requirements change. For example, if an ac-

---

1. The relevant parts of this order were as follows:

Before passing on the question of whether the accused fuel controls infringed the Mock patent, the court desires to have the Trial Division's findings on, and discussion of, the proper scope of that patent in the light of the Edwards TG–180 fuel control and the Woodward 475–013 fuel control which have been alleged by the defendant to be relevant prior art on the issue of the scope of the Mock claims, especially on the question of equivalency. Although in the court's view this matter was sufficiently raised before him, Trial Judge Cooper made no findings on it and did not discuss it in his opinion. IT IS THEREFORE ORDERED THAT the case be remanded to the Trial Division for a supplemental opinion, supplemental findings, and a supplemental conclusion of law relating to the bearing, if any, on the scope of the Mock claims of the Edwards TG–180 and the Woodward 475–013 fuel controls, as well as on the issue of infringement in the light of the proper and valid scope of the Mock claims. Such

supplemental opinion, findings, and conclusion of law shall be based on the record properly made before Trial Judge Cooper, and no further evidence shall be taken or introduced. However, the trial judge to whom the case is assigned may, in his discretion, permit supplemental briefs by the parties on the issues to be determined on this remand, in addition to considering the presentation made to Trial Judge Cooper and to the court; and

IT IS FURTHER ORDERED THAT when the case again comes before the court, after the supplemental report of the trial judge, it shall be assigned for disposition to the above panel. At that time the arguments to be made by the parties shall be confined to the issues embraced in this remand and to the supplemental report covering those issues.

2. The court's findings of fact are not being printed. They are adopted in an order entered this date.

celeration is desired, the throttle is advanced and the fuel flow must be increased but it must not be permitted to increase to the point where the temperature in the turbine section becomes excessive. Conversely, if the throttle is cut back, fuel flow is reduced but it must not be permitted to be reduced to the point where combustion cannot be sustained. During the early 1940's, fuel controls consisted of little more than a fuel valve and an overspeed governor with the principal responsibility for avoiding overtemperature or engine die-out being placed on the pilot.

The problem of proper scheduling of the fuel flow, particularly during transient conditions, is compounded by the widely varying conditions encountered at different altitudes. In an early attempt at solving that problem, the British had developed a control, the Lucas control, which provided a barometric adjustment to compensate for varying altitudes, but careful control of the throttle by the pilot was still required.

It was in the early 1940's that the British-developed gas turbine was brought to General Electric for further development. This engine became known as the I–16 and, later, as the I–40, and still later as the J–33. At about this same time, the Federal Government set up a power control group at Wright Field to investigate and develop an improved fuel control for gas turbine engines. This group entered into contracts with all of the companies in the fuel-metering field, except plaintiff. Plaintiff was the largest manufacturer of carburetor-type controls during World War II and had developed extensive testing facilities and expertise in the field of fuel metering. It was plaintiff's policy to underwrite all of its development costs to develop new products and to sell off-the-shelf hardware. Plaintiff worked with General Electric in designing and building fuel nozzles for the I–16 and the Lucas-type control for the I–40. In 1944, F. C. Mock, an internationally known authority in the field of fuel metering, commenced the work that resulted in the '275 patent.

Mock's interest was to develop a control that would permit a pilot to handle the throttle in any desired manner to effect an acceleration or deceleration, regardless of engine speed or altitude, without danger of overheating or engine die-out. It was his idea to use signals corresponding to various engine-operating conditions and, by continuously monitoring and combining them, to schedule the rate of fuel flow to the engine based on those signals.

The control system disclosed in the patent employs an all-speed governor, a throttle lever for setting a desired speed level for the governor, a metering valve for metering the fuel flow as a function of engine speed, a barometric device for modifying the fuel flow as a function of the temperature and pressure of the air flowing through the engine, and a limiting mechanism for providing an upper and lower limit on the fuel flow over the entire range of engine speeds.

In terms of end result, Mock's invention provides a control system in which, for each position of the throttle, there is a given engine speed at all engine-operating conditions. Further, irrespective of how the throttle is manipulated during transient operations, the control always meters the fuel flow to provide the correct amount of fuel to achieve the desired speed setting. The altitude-compensating mechanism insures proper fuel metering in relation to the mass flow of air at different altitudes.

Accused to infringe claims 1, 3, 4, 5, 7, 8, 11, 12, 13, 14, and 17 of the Mock patent are the 1307-type main fuel controls used for the J–79 series of gas turbine engines and the MFC–type main fuel controls used for the J–85 series of gas turbine engines.

■ In its pleadings, and up to and through trial, defendant steadfastly contended that all of the claims in issue were invalid because of prior art or use. In support of these contentions, defendant had asserted 29 prior art patents and seven publications, identified six individuals as prior inventors of the claimed subject matter, and four individuals as having knowledge of a prior use or sale. Some of these de-

fenses were dismissed for lack of evidence at the conclusion of defendant's case. Before Trial Judge Cooper's decision, it appeared that defendant had dropped all of its invalidity defenses based on prior art or prior work of others, because it proposed no findings and made no argument regarding any of them with respect to invalidity.[3] Those particular invalidity defenses were properly deemed by Trial Judge Cooper to be abandoned, and we do not consider them.

■ The only outstanding attack on the validity of claims 1, 3, and 8 is under 35 U.S.C. § 112 (1976), defendant contending that the claims do not particularly point out and distinctly claim the invention because the claims do not include in the combination a means to obtain altitude compensation. However, it is clear, both from the original application and the issued patent, that altitude compensation is but one feature of the control. Another feature is the speed-responsive aspect, described in claims 1, 3, and 8, and this aspect has utility in a fuel control separate and apart from altitude compensation. (See col. 9, lines 30–55.) Hence, it was entirely appropriate, and consistent with § 112, to present claims to only that aspect. In any event, it is not necessary that a claim recite each and every element needed for the practical utilization of the claimed subject matter. *Cf. United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). For the same reasons, it is concluded that claim 5, attacked on the same ground,[4] is in compliance with § 112.

■ Defendant's principal attack on the validity of the Mock patent is focused on claims 4, 5, 7, 11–14, and 17,[5] and the contention that these claims are invalid for late claiming, citing *Muncie Gear Works, Inc. v.*

*Outboard Marine & Manufacturing Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). In particular, it is defendant's contention that the original Mock application disclosed sensing both inlet air temperature *and* inlet air pressure, and that Mock later (more than one year after a public use and sale) broadened that disclosure, and the claims, by amending them to recite sensing of "pressure and/or temperature." Defendant asserts that if claims containing this limitation are now construed to cover a control system which senses pressure alone, or temperature alone, then the *Muncie* case requires that the claims must be held to be invalid.

Defendant's arguments cannot be accepted. It is clear that Mock's original disclosure was concerned with compensating for changes in the mass flow of air through the engine. One aspect of the mass flow of air is the density of the air, *i.e.,* how much the air in one cubic foot will weigh, which, in turn, is a function of the temperature and pressure of the air. Changes in either or both will alter the density of the air and, hence, will alter the mass of air flowing through the engine. As originally filed, the Mock disclosure correlated the weight of air being pumped through the engine at a given temperature and pressure to the pounds of fuel per hour required to run the engine. Mock's original disclosure also pointed out that, as the density of the air changed, compensation for that change must be made. While the original disclosure did not expressly state that the change in density could come about through either a change in temperature or pressure or a change in both, those skilled in the art at the time

---

3. Defendant did continue to contend that the Mock patent should be construed narrowly because of certain prior art, and that is the issue we remanded for a supplemental decision (*see* note 1, *supra*) and which is dealt with in Part II, *infra*.

4. Defendant also attacks claim 5, as well as claim 7, on the ground they are contrary to and lack support in the patent disclosure. This contention is so plainly without merit as to require no comment.

5. Defendant also contends claim 17 is invalid as being contrary to the specification in that it specifies a *direct* relationship between fuel flow and changes in temperature. Mock's disclosure does contemplate that as the temperature goes up, fuel flow goes down, and vice versa. This relationship is readily discerned from the disclosure, and one having ordinary skill in the art would recognize that the claimed "direct" relation, as applied to the temperature, referred to an inverse effect on the fuel flow.

were well aware of this. Indeed, the fact that a change in either pressure or temperature or both will effect a change in density was known long prior to Mock. Further, the density-compensating capsule disclosed in Mock is inherently capable of responding to changes in either temperature or pressure or to changes in both.

In light of the foregoing, defendant's interpretation of the original Mock disclosure is inconsistent with the clear expressed intent of Mock. Mock wanted to compensate for changes in density, there being no indication that Mock was interested in one kind of density change but not others. Yet, defendant would have Mock ignoring all changes in density except those arising from a change in both temperature and pressure.

It is concluded that the addition of the phrase "pressure and/or temperature" to the specification and claims merely made more explicit what was already clearly disclosed in the original disclosure and what would have been recognized as such by those skilled in the art in 1944. The addition of that phrase did not introduce new matter into the application and claims containing this limitation are entitled to the original filing date of October 9, 1944.

Defendant also asserts that it is licensed under the '275 patent by reason of a contract for the sale of a Mock control to defendant for flight tests to be conducted at Muroc Air Field. Defendant urges that these flights, which took place in 1946, represented the first reduction to practice of the control and, therefore, under the standard patent rights provision in use at the time, defendant is entitled to a royalty-free license. Plaintiff asserts that it had reduced the control to practice prior to these flight tests and that, in any event, the parties expressly agreed in their contract that defendant would not receive a license by reason of the flight tests.

Plaintiff is correct in both of its arguments. The facts are very clear that, between 1944 and March 1946, plaintiff designed, built, and tested the Mock control, then designated the TJ–A1. Its testing included extensive component testing, bench tests, and tests on a stationary gas turbine engine. All of these tests were successful. On March 29, 1946, plaintiff demonstrated the TJ–A1, on a gas turbine engine, to defendant's representatives. It was on the basis of this demonstration, which was entirely successful, that defendant placed an order for a control for flight testing. Upon delivery, the control was installed in an airplane, and successfully operated from the very first flight. While adjustments were made in the control, particularly with respect to the contour of the needle valve, these were largely to tailor the control to the engine.

■■ Defendant contends that the "aircraft" cases, see, e. g., *Farrand Optical Co. v. United States*, 325 F.2d 328, 331–32 (2d Cir. 1963), all required that an invention intended to be used in airplanes must be tested under actual flight conditions before an actual reduction to practice can be shown. Since, the argument continues, Mock's advance lay in a control used to regulate fuel flow which varied with environmental conditions encountered in flight, and since the Muroc flight tests were the first actual flights with the Mock control, it follows that the first reduction to practice occurred at that time. This, defendant asserts, entitles defendant to a royalty-free license.

In *Eastern Rotorcraft Corp. v. United States*, 384 F.2d 429, 431, 181 Ct.Cl. 299, 302–03 (1967), it was held that a reduction to practice has been achieved when the tests conducted show that the invention will work as intended in its contemplated application. In assessing the evidence bearing on a reduction-to-practice question, an impossibly high standard should not be exacted; rather, the practicalities of the situation must be assessed and a determination made as to whether, under the circumstances, the tests conducted were sufficiently comprehensive to demonstrate the workability of the device. As it was stated in *Eastern Rotorcraft:*

Proof of the invention's utility for its intended purpose does not require proof

of its flawlessness; it is only necessary to show that the invention is able to perform its intended purpose beyond a probability of failure. 384 F.2d at 431, 181 Ct.Cl. at 303.

In the present case, the test put forth by defendant, *i. e.,* actual flight conditions, was impossible of achievement by anyone in the entire aviation industry in 1946 since all jet engines were the property of the United States Government and there were no privately owned jet airplanes on which plaintiff, or anyone else, could have tested the devices then being developed for use on this type of craft. The only available options to private industry were to conduct bench tests, which Mock did, and to use the device on a stationary gas turbine, which Mock also did. In addition, the individual components of the device were extensively tested. All of this testing was done prior to the demonstration on March 29, 1946.

■ In light of these facts, it is apparent that, prior to March 29, 1946, Mock had shown that his control could perform its intended purpose beyond a probability of failure and it was because of its success that defendant ordered the first TJ–A1 control. That the workability and probable success of the Mock control had been demonstrated and recognized by defendant prior to the flight tests is further revealed by the fact that the TJ–A1 control was immediately installed as the only fuel control on the jet engine of the airplane with which the first flight tests were conducted. It would be odd indeed to conclude that the workability of the control for its intended purpose of regulating fuel flow to a jet engine had not been previously shown when defendant, and its test pilot, had enough confidence to put it on an airplane and fly for over an hour with it, the very first time out. These are the practical facts which demonstrate the prior reduction to practice by plaintiff [6] and relegate to the category

of perfecting modifications the minor adjustments to the control resulting from the flight tests. Since none of the claims is directed to these adjustments, *e. g.,* the contour of the needle, defendant is not entitled to a license.

Defendant's license defense must fail for the additional reason that the parties expressly contracted to exclude the TJ–A1 control (which incorporated the Mock invention) from any license defendant might receive by reason of their contractual relationship. In particular, the contract executed by the parties included the provision that:

> * * * the power control disclosed in the attached blueprints of Contractor's Drawing Nos. FXR–17105, FXR–17103, and FXR–17063 and all inventions, improvements, and discoveries embodied therein are deemed to have been heretofore actually reduced to practice, and the expression "Subject Invention" in this paragraph and paragraph (a) above, shall be construed to exclude any of such inventions, improvements and discoveries.

Of the three drawings mentioned in that provision only Drawings FXR–17105 and FXR–17103 were available at trial. There is a substantial controversy as to the third drawing, plaintiff contending there never was an FXR–17063 drawing and that the drawing intended was one designated FXE–17063. That contention is supported by the parties' correspondence in which an FXE–17063 drawing was discussed; however, neither party has been able to locate a copy of that drawing. Defendant contends that the inability of either party to produce the drawing precludes plaintiff from proving up the device that was the subject of the exclusionary clause.

■ It is well settled, under the best evidence rule, that in proving the contents of a document, the document itself must be

---

**6.** Defendant suggests that the test for a reduction to practice should be whether "persons qualified in the art are willing to manufacture and sell the invention, as it stands," paraphrasing *Sinko Tool & Mfg. Co. v. Automatic Devices Corp.,* 157 F.2d 974, 977 (2d Cir. 1946).

Even under that test, plaintiff prevails for, after using its own funds to develop the TJ–A1, plaintiff was willing to manufacture and sell the control before any flight tests, *and in fact did so.*

produced unless it is shown to be unavailable through no fault of the proponent. If it is satisfactorily shown to be unavailable, secondary evidence as to its contents may be received. *See* C. McCormick, Evidence § 201 (Hornbook ed. 1954); Fed.R.Evid. 1004.

■ That is plainly the case here. The drawing being unavailable through no fault of plaintiff, and in view of its importance to the license issue, secondary evidence was received as to its content. Plaintiff's presentation, unrebutted by any evidence by defendant, demonstrated beyond any reasonable doubt that, in fact, the FXE drawing was the one intended, that an FXR–17063 drawing never existed, and that the content of the FXE–17063 drawing was substantively the same as two other drawings that were available to the court. Based on the content of those drawings, which clearly disclose a barometric control, there is no question but that the parties agreed to exclude from the patent rights clause the TJ–A1 control incorporating the principles of the '275 patent. Accordingly, defendant has no license under the claims of that patent.

Defendant's additional argument that it is entitled to a license irrespective of the agreement executed by the parties is utterly without merit. The facts are that plaintiff rejected the boiler-plate patent rights article proposed by defendant and, after many months of negotiations, the parties reached an agreement on terms that were precisely the same as those demanded by plaintiff when it rejected defendant's original proposal. Defendant's contention that, notwithstanding these facts, plaintiff somehow is bound by defendant's original proposal is simply incomprehensible. Equally without merit is defendant's argument that the contracting officer exceeded his authority in accepting the contract with a modified patent rights provision. Defendant's own witness, Gen. William Zoeckler, testified that the executed contract was the result of months of negotiations, participated in by individuals at various levels, ratified by the appropriate individuals, and that it accurately reflected the intentions of the parties.

## II

### *Mock patent—infringement*

The question of infringement by the accused devices turns on the proper scope of the Mock patent. Defendant has strongly urged that, in light of the Edwards TG–180 fuel control and the Woodward 475–013 fuel control, Mock should be read narrowly, and that so read the accused devices do not infringe. Without discussing or apparently considering the Edwards and Woodward controls, Trial Judge Cooper found infringement.[7] We remanded for consideration of the Edwards and Woodward controls (*see* note 1, *supra*) and Trial Judge Browne

---

7. In his opinion, Trial Judge Cooper said: "With respect to the issue of infringement [he noted that "claims 4, 5, 11, 12 and 13 are illustrative of the manner in which the claims read on the accused structure for purposes of establishing liability"], both the 1307 and MFC controls seek to regulate fuel flow as a function of the mass of air flowing through the engine. To that end, both controls are responsive to variations in engine speed to provide a signal that is a function of speed and, in addition, both are responsive to engine operational parameters based on temperature and pressure of the air to provide a signal that is a function of mass air flow. Mock senses compressor inlet air temperature and compressor inlet air pressure, while both the 1307 and MFC controls sense compressor inlet air temperature and compressor discharge pressure, the latter being a function, in part, of entering air conditions including inlet air pressure. The signals in the Mock arrangement and the signals in the 1307 and MFC controls are employed to schedule fuel flow to the engine during steady state and during transient operations. In addition to performing substantially the same functions as Mock, substantially the same kinds of structures operating in substantially the same way as Mock are used by both types of accused controls. That is sufficient to make out a case of infringement. *Autogiro Co. of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967). While both of these controls possess features in addition to the basic operational combination of Mock, that does not avoid infringement."

discussed the problem extensively and again found infringement. With several deletions and modifications,[8] his opinion forms the basis for this Part II of the court's opinion.

The crux of the problem may be put as follows: Trial Judge Cooper found infringement because, in his view, sensing compressor discharge pressure (CDP) and modifying the flow of fuel to the engine in proportion thereto was equivalent to sensing compressor *inlet* pressure (CIP) and modifying the flow of fuel to the engine in proportion thereto. The trial judge resorted to the doctrine of equivalents in reaching his ultimate conclusion of infringement, since the alleged infringing devices sensed compressor *discharge* pressure to modify the flow of fuel to the engine when operated in an acceleration mode, while the claims of the Mock patent specify the sensing of pressure of the air flowing *to or through* the engine or the burner. While the broader claims of the Mock patent are not limited to sensing any particular pressure parameter, the "preferred embodiment" or "best mode" disclosed in the Mock patent refers to compressor *inlet* pressure rather than the compressor *discharge* pressure as the parameter for modifying the fuel flow to the engine. Trial Judge Cooper's conclusion that sensing compressor *discharge* pressure is the equivalent of sensing compressor *inlet* pressure was based on the fact that it is immaterial to the properties (e. g., density) of the air mass, passing to or through the compressor, which pressure is sensed inasmuch as there is a relationship between the properties (e. g., density) of the air mass at the inlet to those properties, such as density, of the air at the discharge of the compressor.

Defendant contends that compressor discharge pressure may not be treated as the equivalent of compressor inlet pressure, since the respective alleged prior art fuel controls designed by Edwards[9] and Woodward[10] disclose the concept of sensing compressor *discharge* pressure for modification of the fuel flow to the burners. These references, defendant maintains, while not relied upon as prior art or prior work of others to invalidate the Mock patent, afford a basis for limiting the *scope* of the claims of the Mock patent. Thus, defendant argues that there can be no infringement of the Mock patent claims if the accused devices utilized a discharge pressure sensor as embodied in the Edwards or Woodward designs, even though the accused devices may respond to the literal terms of the Mock claims. Defendant, in effect, seeks to exclude consideration of the doctrine of equivalents on the theory that even if the *terms* of the Mock claims are met, the *scope* of those claims is limited to the use of compressor *inlet* pressure, since that is the location of the sensor in the "best mode" of the system disclosed by Mock and for the further reason that the prior art, viz., the Edwards or Woodward designs, do not disclose the sensor in that location.

In dealing with this contention, we cannot forget that defendant abandoned any claim that the Mock patent was invalid, because of prior art, under 35 U.S.C. §§ 102 and 103 (1976) (*see* Part I, *supra*). Though we may now take account of alleged prior art, consideration of the scope of the Mock patent in that light should not be turned into a camouflaged or back-handed attack on Mock's validity. The infringement issue in this case always remains one of the scope of the Mock patent, and it is datum of our discussion of that question that defendant does not assert the invalidity of the patent (on the basis of prior art). *Compare Do-*

---

8. We adopt Trial Judge Browne's conclusion (for the most part) and much of his reasoning but we find it unnecessary to adopt all of his discussion.

9. Edwards, *et al.* U.S. Patent 2,622,393 and General Electric Data Folder No. 71322, issued June 12, 1944.

10. Woodward Governor Company drawing, dated February 7, 1944.

minion *Magnesium Ltd. v. United States,* 320 F.2d 388, 162 Ct.Cl. 240 (1963), *and Soundscriber Corp. v. United States,* 360 F.2d 954, 175 Ct.Cl. 644 (1966). Where validity (because of prior art) is not challenged, as here, the court is somewhat less free to construe the claims of the patent to avoid possible or putative invalidity (for example, with respect to equivalents) than where invalidity is likewise urged by the alleged infringer.

A. *The innovative aspects of the Mock invention (relative to this case):* The Mock fuel-metering control system provides, for each position of the throttle, a given engine speed under all engine-operating conditions. The fuel supply is scheduled primarily on the basis of the desired engine speed, yet is modified by sensing changes in the density of the entering air. In the preferred embodiment or "best mode" disclosed by Mock, an altitude-sensing and temperature-sensing mechanism or "capsule" (in the form of a bellows), modifies the fuel flow to the engine in relation to changes in temperature and pressure of the air mass flowing to the engine.[11] Since the *density* of the air mass varies according to the altitude, temperature, and air speed, the fuel system is designed to establish and maintain a predetermined fuel/air [12] ratio between the fuel and the air mass supplied to the engine burners.

Mock, therefore, regulates fuel flow as a function of the properties of the mass of air supplied *to* the *burner through* the *compressor.* Mock recognized that since the compressor speed is dependent on engine speed (r. p. m.), the latter is the principal factor bearing on the flow of the air mass into and through the compressor, thence into the burner. Thus, Mock controls engine operation by scheduling fuel flow primarily as a function of engine speed. Additionally, Mock provides automatic compensation for changes in the properties of the incoming air mass resulting from variations in the density of the air, the density being dependent upon temperature (which normally decreases with increase in altitude), atmospheric pressure (which also normally decreases with increase in altitude), and "ram" pressure [13] (which increases as the linear speed of the aircraft increases). Thus, while Mock's fuel-metering control schedules the flow of fuel primarily as a function of the engine speed parameter, the amount of fuel required to maintain that parameter is modified by changes in the temperature and/or pressure of the air mass ultimately supplied to the engine burners through the compressor.

Mock's inventive contribution contemplated the use of signals corresponding to various engine-operating parameters and conditions. In particular, Mock taught that by continuously monitoring and combining the signals; *viz.,* engine speed, air pressure, and temperature of the air flowing to the engine, fuel flow to the engine could be successfully scheduled on the basis of those combined signals. Mock's concept, as embodied in the '275 patent, was to regulate fuel flow as a function of the mass of air flowing through the engine (*i. e.,* from the vicinity of the air intake, through the compressor, through the burner, through the turbine, and to the engine air discharge or exhaust).

Mock's invention also discloses the use of a valve arrangement consisting of a combi-

---

11. "Engine" is defined in the Mock specification as including the compressor, the burner, and the turbine.

12. Since it is a known fact that fuel requires a given amount of oxygen to initiate or maintain combustion, it is really the percentage of oxygen in the air mass which is critical in jet engine combustion systems. Therefore, it is the fuel/*oxygen* ratio which should be determinative of the other parameters. Since the air (oxygen) responds to the principles of Boyle's

Law of compressibility of gases, the density of the air (oxygen) changes with variations in the pressure and temperature of the air mass.

13. "Ram" pressure is a measure of the pressure of the air entering the engine, *viz.,* the equivalent of compressor inlet pressure. *Marks' Standard Handbook for Engineers,* (7th ed., 1967) *11*–113, 114.

nation of orifices and piston provided with lands of predetermined dimensions which serve to control the flow of fuel and thereby limit the rates of acceleration and deceleration of the engine. The rate of acceleration is limited so that the engine will not reach an overtemperature condition while the rate of deceleration is limited so that engine "die out" will not occur. By selecting the relative dimensions of the orifices and the lands of the piston, the fuel flow curves during acceleration and deceleration can be predetermined and properly adjusted to define an upper limit of flame temperature and a lower limit of leanness of the fuel/air mixture, irrespective of how quickly the power control lever is advanced or retarded.

Thus, for the purposes of the infringement issue in this case, the inventive aspects of the Mock invention reside in these features:

(a) The conception that the flow of fuel to the engine should be scheduled as a function of the mass of air flowing to or through the engine, which flow is, in turn, primarily a function of air speed. (Mock employed an all-speed governor to facilitate the scheduling of fuel in proportion to the speed of the engine).

(b) Mock modified the rate of fuel delivery in proportion to engine speed by an amount sufficient to compensate for changes in pressure and/or temperature of the air flowing to or through the engine. (A pressure and/or temperature sensor is employed which regulates the amount of fuel delivered to the engine. The precise location of the sensor is not considered critical [14] so long as it senses changes in the properties of the engine air mass).

(c) *Mock also employs acceleration and deceleration limits to prevent development* of an excessively high temperature during acceleration or an excessively lean fuel mixture during deceleration.

B. *Comparison of the Edwards and Mock inventions (as related to this case):*

1. The fuel control system described and illustrated in the Edwards invention utilizes an all-speed governor, schedules fuel flow between predetermined limits as a function of engine speed and atmospheric or compressor discharge pressure, and utilizes the tail pipe temperature parameter as an auxiliary overtemperature safeguard. An external linkage is also described therein which serves to convert the overspeed governor (useful for the TG–100 engine) to an all-speed governor (useful for the TG–180 engine).

The Edwards control schedules fuel flow *during acceleration and deceleration* by sensing compressor discharge pressure only and schedules fuel flow *during steady-state* by sensing compressor discharge pressure in combination with engine speed. The defendant's position, as stated *supra*, is that the Edwards fuel control, which schedules fuel flow as a function of compressor discharge pressure (either alone or in combination with engine speed), must necessarily narrow the scope accorded the claims of the Mock patent so that the accused devices (which defendant maintains also schedule fuel flow as a function of compressor discharge pressure) cannot be held to be within the scope of the Mock claims thus limited.[15] In effect, defendant maintains that the Edwards fuel control prevents the plaintiff from establishing equivalence between sensing pressure at the compressor *inlet* and sensing pressure at compressor *discharge*.

2. The fact is, however, that (so far as this case is concerned) the core teachings of

---

14. We shall discuss this proposition *infra*.

15. Defendant asserts that the Mock claim language which calls for means to sense pressure and/or temperature changes of the air flowing "to the burner" or "to the engine" cannot include means for sensing these changes at the compressor *discharge* since, defendant maintains, the location of the sensor at this latter location is clearly shown by Edwards and/or Woodward, both of which are submitted to be applicable as "prior art" in the sense of limiting scope but not in the sense of being statutory bars.

the Mock patent differ significantly from those of Edwards. The Edwards disclosure teaches the use of engine speed and compressor discharge pressure as controlling parameters in the regulation of the flow of fuel to the engine burners. Mock, on the other hand, uses the speed parameter as the primary controlling parameter to schedule fuel in all modes of operation. But Mock's schedule of fuel flow in proportion to speed is also biased by sensed changes in the pressure and/or temperature of the air entering the engine, i. e., changes in entering air density. While engine speed (the primary controlling parameter in Mock) is a factor in determining compressor discharge pressure (the controlling parameter in Edwards), the two variables are not equivalent. Modifying the flow of fuel in relation to sensed changes in air speed is not the same as modifying the flow of fuel in relation to sensed changes in compressor discharge pressure. Compressor discharge pressure is influenced by engine speed, inlet air temperature, inlet air pressure, aircraft velocity, the position of the compressor air bleed, the position of the inlet stator vanes, and the existence of moisture.

Thus, the major difference between the Mock invention and the Edwards *et al.* system is that, in Mock, the flow of fuel is scheduled as a primary function of engine speed, said flow being biased as a function of air density (density being dependent upon changes in pressure and/or temperature of the entering air), whereas Edwards schedules fuel flow as a function of engine speed and/or compressor discharge pressure (depending upon the mode of the engine). It is very important to note that the Edwards *et al.* system, while compensating for changes in the *pressure* of the entering air, i. e., by employing *altitude* compensating means, does not compensate for changes in density of the entering air attributable to changes in the *temperature* of the entering air. Mock's invention, on the other hand, in fact, biases the flow of fuel if a temperature change causes a change in the density of the entering air. In Mock, but not in

Edwards, sensed temperature changes can play a significant role in monitoring the flow of fuel.

The Edwards fuel control system utilizes compressor discharge pressure as a sensed parameter, whereas Mock employs a parameter which is dependent upon changes in only pressure and/or temperature of the entering air, *viz.*, density. To the extent that the Edwards *et al.* system biases fuel flow as a function of compressor discharge pressure, it should be realized that such pressure results from many variables, only *one* of which is inlet air temperature. Mock's invention, therefore, isolates *density* of the entering air, as the modifying parameter, while Edwards' biasing parameter (compressor discharge pressure) does not isolate *changes* in air *density* but, rather, is dependent upon many other factors. Thus, while a change in density of entering air will alter the flow of fuel in Mock, it is possible that such a change in density will *not* alter the flow of fuel in the Edwards *et al.* system if the other variables making up compressor discharge pressure also change so as to hold compressor discharge pressure constant.

3. Another important difference relates to the varying methods for preventing engine overtemperature. As disclosed in the specification of the patent which ultimately issued on the Edwards invention, the thermal devices are located in a position to sense the tail cone temperature, i. e., the exhaust gas temperature. If the sensed temperature of the tail cone is below the maximum safety temperature of the engine, the thermal devices do not restrict the flow of fuel to the engine burner section. If the temperature sensed at the tail cone exceeds the maximum safe temperature of the engine, the thermal devices will immediately restrict the flow of fuel to the engine burner, and thus avert an engine overtemperature condition. Thus, the Edwards device employs means to operate the engine at a maximum safe temperature level but prevents operation at temperatures above

that value in order to prevent excessive stresses and premature deterioration of the various structural elements of the power plant. When the maximum safety temperature is exceeded, the thermal means seizes control of the fuel supply. After a consequent decrease in temperature occurs, the fuel supply to the combustion chambers is slowly increased in order to gradually approach the maximum safety temperature and still prevent an overtemperature condition.

Mock's invention also solves the problem of engine overtemperatures. Mock, however, by *predesigning* the relative areas of specific orifices and piston associated therewith, limits the *rates* of acceleration and deceleration so that the engine cannot either die out or reach an overtemperature condition. Mock's method of preventing an overtemperature condition is by using a predetermined limit on the rate of acceleration as contrasted with Edwards' method of monitoring actual exhaust gas temperature. Thus, irrespective of *actual* temperature of the exhaust gases, Mock's device cannot accelerate at a rate greater than the rate which the system, as predesigned, will allow. Mock's means for avoiding an overtemperature condition contemplates the maximum safety temperature never being reached, while Edwards' overtemperature control means is operable only *after* the maximum safety temperature is exceeded. Of course, Edwards could set the "triggering" temperature of the overtemperature prevention means slightly beneath the maximum desired temperature so that the maximum safety temperature is not reached.

In partial summary on this point, both Mock and Edwards employ means to prevent overtemperature of the engine. The means to achieve the desired end are substantially different, yet both successfully achieve the desired result. An important distinction between the two means resides in the fact that the Mock invention *pre* selects the maximum rate of acceleration by *pre* designing the relative areas of the piston and orifices, while the Edwards maximum temperature is variable, *i. e.*, dependent upon the load output selected by the manual control mechanism of the engine. Thus, the maximum safety temperature of the Edwards device varies as a function of the load, while the maximum acceleration rate of Mock is a constant independent of load. Mock's device cannot increase the rate of acceleration past the predetermined maximum rate irrespective of the actual temperature of the entering air. It should be remembered, however, that Mock, independent of its overtemperature prevention means, does sense changes in entering air temperature in its attempt to bias the speed control as a function of the density of the entering air.

The Edwards device discloses a stop limit for preventing engine die out, which condition might occur in the event of abrupt deceleration. The Mock invention, on the other hand, by use of the aforementioned orifices and piston, controls the rates of acceleration and deceleration and places a lower limit on the *rate* of deceleration to prevent engine die out. Thus, the possibility of engine die out is eliminated in both the Mock and Edwards inventions.

C. *Comparison of the Woodward and Mock inventions (as related to this case):* The Woodward 475–013 fuel control is an automatic fuel control which meters fuel primarily as a function of engine speed. The system includes a fuel pump, a speed-responsive mechanical governor, a metering restriction upstream of the burner nozzle, and a differential relief valve which maintains a constant pressure differential across the metering valve. The metering restriction employed in the fuel control system is located upstream of the burner nozzles and thus serves to eliminate the disadvantages inherent in nozzle back pressure.

The mechanical governor or flyweights in the system are driven as a function of engine speed. The system employs a "rate of pressure rise limiter" which prevents the engine from reaching an overtemperature

condition. A minimum fuel flow stop is also provided which serves to prevent engine die-outs. Additionally, a pressure responsive element (referred to as a "dedrooper" mechanism), which modifies the flow of fuel as a function of changes in the aircraft altitude, is also disclosed.

The Woodward fuel control system embraces a few of the features of the Mock invention. More specifically, Woodward's fuel control, like Mock's, uses engine speed as the primary parameter for scheduling the flow of fuel to the engine burners. Both the Mock fuel control and the Woodward control also teach the use of a lower limit fuel supply means for preventing engine die-outs. Both controls accomplish this function by providing a minimum flow of fuel to the engine burners even when the engine is in a deceleration mode.

There is no disclosure or teaching in Woodward that the flow of fuel should or could be varied as a function of the change of *density* of the mass of air flowing to the engine burners. Furthermore, as in Edwards, there is no disclosure of the concept, or a means for carrying out the same, of modifying the flow of fuel as a function of changes in the *temperature* of the air flowing to the engine. While an *overtemperature* prevention means is provided in the Woodward fuel control, this means operates by limiting the rate of pressure rise of the fuel flow. Mock, on the other hand, as previously discussed, prevented the occurrence of overtemperature conditions (by predetermining the maximum rate of acceleration) by predesigning the relative areas of orifices and piston by means of which the fuel flow is controlled. As previously emphasized, Mock's solution to the overtemperature problem was to predesign the acceleration rate of the control and place a limit thereon. Woodward, however, limits the *pressure rise* in the system due to a call for increased fuel when acceleration is desired. These two means for preventing overtemperature conditions are substantially dissimilar.

Mock discloses means for *increasing* the flow of fuel due to a change in entering air temperature even if entering air pressure remains constant. This important aspect of the Mock invention is noticeably absent from the Woodward teaching.

Wooward did not appreciate the desirability of using a sensor for the changes in entering air *density* to modify or bias the flow of fuel previously metered as a function of engine speed even though he discloses a pressure sensing means in the form of a "dedrooper" mechanism. Sensing the changes in entering air *density*, as Mock does, is substantially different from sensing merely the change in pressure, as Woodward does. The density sensing device of Mock is, indeed, one of the most important aspects of his invention.

In conclusion, the Woodward fuel control, while antedating Mock's conception date, does not disclose the essential inventive concepts or substance of the Mock invention taken as a whole. At the very most, Woodward teaches a fuel control primarily·dependent upon engine speed wherein the location of the fuel restriction is upstream of the burner nozzles, which location avoids nozzle back pressure. There is a total absence of the appreciation of the effect of the changes of *density* of the air flowing to the engine and its effect upon the required flow of fuel in the Woodward disclosure. Neither does Woodward disclose a sensing means which will adjust the fuel flow when and if changes in air *density* are due solely to changes in the *temperature* of the air flowing to the engine. Finally, the differences between Mock's solution to the overtemperature problem, and the solution offered by Woodward, are substantial. We hold that the Woodward disclosure, like the Edwards invention, does not fairly teach nor does it inherently disclose the inventive substance of the invention claimed by Mock.

■ D. *Scope of the Mock claims in suit:* Because of the basic differences (neither minor nor cosmetic) between the Mock

concept and the Edwards and Woodward inventions, there is no need to labor, on account of the latter, to construe the Mock claims more narrowly than one would normally do.[16] Putting Edwards and Woodward aside, we come then to consider the proper scope of the Mock claims.

1. Each of claims 4, 5, 7, 11, 12, 13, 14, and 17 of the Mock patent contains "means plus function" language in defining the element for sensing changes in the pressure and/or temperature of the air, as permitted by 35 U.S.C. § 112 (1976). The "means plus function" terminology used in the foregoing claims requires a structure capable of sensing changes in pressure and/or temperature of the air and modifying or affecting fuel flow as the pressure and/or temperature of the air changes. A careful reading of the claims containing the "means plus function" language indicates that the means for sensing the changes in the pressure and/or temperature of the air may be located (a) where the air flows *to the engine* (claims 5, 7, 11, 12, and 13); (b) where the air flows *to* the *burner* (claim 4); (c) where the air *enters* the *compressor* (claim 17), or (d) any other reference location (claim 14). It is clear, therefore, that Mock did not intend to exclude the location of the air pressure sensor at the point of compressor discharge, inasmuch as claim 4 specifies that the pressure may be sensed at that point. (Mock, however, described that point as being where the air flows "to the burner.")

Claims 4 and 17 are the only claims which specify the part of the engine where the pressure and/or temperature parameter is sensed, *i. e.,* at the entrance to the burner (claim 4) and at the compressor inlet (claim 17). But as previously mentioned, Mock defines "engine" as comprising the compressor, the burner, and the turbine. Thus, the language used in the asserted claims, interpreted in the light of the specification

and in light of each other, makes it clear that Mock intended that the location of the means for sensing changes in pressure and/or temperature is not critical, since the means may be located either at the compressor inlet, the compressor discharge, the burner inlet, the burner outlet, the turbine inlet, or any other location where "any other reference pressure" may be sensed. Thus, the claims of the issued patent clearly indicate that Mock contemplated and considered his inventive contribution to be the sensing of either atmospheric pressure or "any other reference pressure" to modify the flow of fuel to the engine *regardless of the location of the pressure sensitive means.* The use of *any* reference pressure, therefore, clearly includes the use of compressor *discharge* pressure as the sensed parameter for the modification of flow of fuel.

In the same connection, plaintiff correctly points out that Mock is not limited only to a *direct* measurement of *inlet* air density and that the air flowing *through* the engine is the same as the air *entering* the engine. Plaintiff submits that it is apparent that the air flowing *through* the engine (and which is ultimately discharged from the engine) is the *same* air that *entered* the engine. Furthermore, the plaintiff directs the attention of the court to the fact that Mock is concerned with sensing *changes* in properties of the air mass and not the instantaneous measurement of density or pressure *per se* of the air at any given point. Plaintiff maintains that it was Mock's concept to sense *changes or variations* in the pressure and/or temperature of the air flowing *through* the engine to schedule the flow of fuel to the engine. In other words, the Mock invention is not limited to sensing only *inlet* conditions but, rather, is directed to sensing reference conditions which reflect *changes* in the properties of the air mass *entering or flowing to or through* the sections of the engine, *including the compressor.*

---

**16.** Because Mock differs in its basic concept from both Edwards and Woodward, the Mock claims need not be read narrowly simply because Edwards or Woodward may have some individual features which Mock also has.

For this reason, defendant errs in its stress on the measurement of compressor discharge pressure with respect to the scope to be accorded the claims of the Mock patent. In the first place, the claims in suit do not depend on the properties of the air mass, *per se*. They distinguish the Mock invention from the relevant references by utilizing *changes* in the properties of the air mass (*viz.*, pressure and/or temperature) to effect the desired function of the means for modifying fuel flow. In the second place, the references clearly equate the use of compressor discharge pressure as a sensing parameter for the modification of the flow of fuel to the use of another reference pressure, such as atmospheric pressure. Mock equates compressor inlet pressure to atmospheric pressure or *any other* reference pressure. Since both Mock and the references utilize *any* reference pressure to modify fuel flow in *all* engine-operating modes (*viz.*, acceleration, deceleration or steady state), use of one reference pressure in lieu of another does not avoid the use of Mock's patented concept.

2. The text of claim 4 (which is illustrative of claims having "means plus function" language for adjusting fuel flow in response to changes in pressure and/or temperature) is set forth in the margin of this opinion.[17]

The illustrative claim is directed essentially to a system for controlling the supply of fuel to the burner nozzles of gas turbine engines, which engines are adapted to operate at various speeds and at varying ambient air pressures and/or temperatures. Claim 4 simply calls for a gas turbine engine fuel feeding system comprising a spray nozzle through which the fuel is fed to the burner (*i. e.*, the combustion chamber); a fuel conduit for conducting fuel to the nozzle; a restriction in the conduit upstream of the nozzle; means to increase the rate of fuel flow through the restriction in relation to an increase in engine speed; and *means responsive to changes in the pressure and/or temperature of the air flowing to the burner which automatically modifies the rate of increase of said fuel flow*.

The focal issue stressed by defendant is whether compressor discharge pressure is the legal equivalent of compressor inlet pressure. But it is not necessary to invoke the doctrine of equivalents to establish infringement of claim 4 when defendant describes the parameter which modifies fuel flow as the compressor discharge pressure. When Mock defines the location of the "means" which is responsive to changes in pressure and/or temperature in claim 4, he indicates that the "means" is so positioned as to sense changes in the pressure and/or temperature of the air flowing *to the burner*. In the light of Mock's specification, this can only mean that the changes in pressure and/or temperature of the air are sensed as the air is discharged from the compressor, since it is *the air discharged from the compressor* which flows *to the burner*. Accordingly, measurement of the pressure of the air flowing to the burner is measurement of the compressor discharge pressure. The claim applies literally by its own terms to devices (like the accused devices) using compressor discharge pressure.

3. Less precisely, claims 5, 7, 11, 12, 13 and 14 can also be read without strain to cover a sensor of compressor discharge pressure. All of those claims (except 14) [18] refer to changes in pressure and/or tempera-

---

17. "4. In a system for feeding fuel to the burner of a gas turbine engine a spray nozzle for said burner,

a fuel conduit leading to said nozzle and having a feed restriction upstream of the nozzle,

*means driven in relation to engine speed* arranged to automatically produce an increase in the rate of flow through said restriction with an increase in *engine speed*,

and *means responsive to changes in the pressure and/or temperature of the air flowing to the burner arranged* to automatically modify the rate of increase." [The format of the claim has been revised, and certain key words have been given emphasis for sake of clarification or easier understanding.]

18. Claim 14 gives no locating reference at all.

ture of the "air flowing to the engine"—and Mock, as we have said, defines "engine" as comprising the compressor, the burner, and the turbine. Accordingly, reading "air flowing to the engine" as covering "air flowing through the engine" (*i. e.*, air flowing to any or all of the parts of the engine), the means for sensing pressure or temperature changes can be located at any point within the engine.

4. It is only by invoking the doctrine of equivalents that claim 17 can be held to be infringed by the accused devices, since it is necessary to substitute a sensor of changes in the pressure of the air *entering* the compressor (CIP) for a sensor of changes in the pressure of the air *discharged* from the compressor (CDP).[19] But we have already emphasized, several times, that Mock contemplates the use of any of several points for sensing changes in pressure and/or temperature of the air flowing to and through the engine. While the Mock patent disclosure specifically refers to changes in the temperature and/or pressure of the "entering air," broader language in the specification indicates that changes in "any other reference pressure" may be employed. Thus, the disclosure contemplated the possibility that the changes in pressure for modification of the fuel feed could possibly be sensed where the air enters any section of the engine, including the point of compressor *discharge (i. e.*, the point where the air passes "to the burner"). In any of these possibilities, it is changes in air density which are sensed for the purpose of monitoring fuel flow—and for Mock's objective it is unimportant whether the changes are

sensed at the point of the compressor inlet or at the compressor discharge point or at some other spot. For that reason, sensing changes in compressor discharge pressure is the equivalent of sensing changes in compressor inlet pressure, thus sensing changes in the density of the air entering the engine as it flows through the engine. For the Mock conception, it is not significant that one cannot determine the precise value of CDP by sensing the value of CIP (*or* vice versa), or that the quantitative value of one measure will not be the same as the value of the other. The important thing for Mock is that fuel flow be monitored (in part) by means sensing *changes* in pressure and/or temperature of the air mass. Gauging *changes* is the essential feature. Compressor discharge pressure (which is itself a function, in part, of entering air conditions including inlet air pressure) can do that as well as compressor inlet pressure. It is changes in air density which are sensed in either case. CIP and CDP are therefore functionally equivalent for Mock's purpose of sensing changes in density of the air mass, even though the numerical or quantitative measure of one may not be the same as of the other.[20]

▆ E. *Infringement by the accused devices:* On the basis of the scope of the Mock claims as discussed in the preceding portion of this opinion, we hold that the accused devices infringe claims 4, 5, 7, 11, 12, 13, 14 and 17 of the Mock patent.

(1). *The 1307 system* : The accused 1307 fuel control system used by defendant in-

---

**19.** Claim 17 specifies the part of the engine at which the pressure and/or temperature is sensed as the compressor inlet.

**20.** Defendant says that in *Pratt and Whitney v. United States*, 170 Ct.Cl. 829, 882, 884, 838, 345 F.2d (1965), the court has already held that compressor inlet temperature cannot be combined with compressor discharge pressure to measure air density, and also that compressor inlet pressure (CIP) is not the equivalent of compressor discharge pressure (CDP). Those findings were made with respect to a wholly different invention and device (utilizing a measure of entering air density, not changes in air

density), in which the functions of CIP and CDP were different from Mock. The reference in *Pratt and Whitney* to measuring density was to air density at the particular spot or point of entry—not, as here, to *changes* in the qualities and conditions of a flowing air mass. In this case we have used "density" in the latter, broader sense, not in the narrower meaning of the weight of the air per unit volume at a specific, given point like the entry point. Accordingly, *Pratt and Whitney* has no bearing here.

cludes a system which senses various engine-operating parameters and, in response to the conditions sensed, modifies the fuel flow rate. The engine-operating parameters employed in the 1307 system for controlling fuel flow are engine speed and *both* compressor discharge pressure (CDP) and compressor inlet temperature (CIT). The evidence establishes that the 1307 fuel control (in the J–79 engine) uses the same parameters as Mock. It combines signals which are a function of speed and those which are a function of the flow of the air mass (in the same manner as Mock) to control a metering restriction for automatically scheduling fuel flow (for the same purpose as Mock).[21]

Defendant seeks to avoid a finding of infringement by arguing that during steady state operation of the accused fuel control system, only the parameter of *engine speed* affects the fuel flow to the engine. Defendant asserts that since the compressor discharge pressure and the compressor inlet temperature are not *utilized* when the system is in the *steady state mode,* those parameters have no effect whatever upon the metering valve or the fuel flow rate. This assertion is, however, directly contrary to our findings.

> * * * During steady-state operation, engine speed, as sensed by the governor, is the main parameter used to maintain the correct fuel flow; however, *any substantial variation in the mass air flow as sensed by the CDP or CIT sensors would be effective to adjust the fuel flow.* (emphasis added)

■ The Government further maintains that during the *acceleration* mode, of the three parameters of (a) engine speed, (b) compressor discharge pressure, and (c) compressor inlet temperature which affect the fuel flow, the compressor *discharge* pressure is the *primary controlling* parameter (as distinguished from Mock's use of engine speed as the primary parameter), while the compressor inlet temperature performs a mere "trimming" effect on the compressor discharge pressure parameter. This, however, is also contrary to our finding:

> * * * During an acceleration, *all three* engine parameters, plus a three–D cam and a cam indicative of actual fuel flow, are employed to limit the fuel flow rate to the maximum permissible rate. (emphasis supplied)

The fact remains that the 1307 fuel control for the J–79 engine utilizes the same parameters as Mock, employing signals which are a function of air mass flow (in the same manner as Mock) to control a metering restriction for the purpose of automatically scheduling fuel flow (just as in Mock). The mere fact that the accused controls may be more sophisticated in sensing variations in mass air flow by sensing compressor *discharge* pressure (pressure of the air flowing "to the burner") as a controlling reference signal does not allow the accused controls to escape the web of infringement. *Kelley-Koett Mfg. Co. v. McEuen,* 130 F.2d 488 (6th Cir. 1942), *cert. denied,* 318 U.S. 762, 63 S.Ct. 662, 87 L.Ed. 1134 (1943); *Marston v. J. C. Penney Co.,* 353 F.2d 976 (4th Cir. 1965), *cert. denied,* 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966).[22]

(2). *The MFC system*: The accused MFC (main fuel control) control includes a system which senses various engine-operat-

---

**21.** We point out *supra* that Edwards does not use *temperature* and for that reason (among others) the 1307 device cannot be said to be closer to Edwards than to Mock.

**22.** See finding 28:

   28. Both the '275 patent and the 1307 system employ mechanisms which regulate fuel flow during steady state and transient conditions as a function of engine speed and mass air flow. Both have means for limiting the fuel flow during transient conditions within predetermined limits and both have means for sensing the conditions of the mass of air flowing through the engine and modifying the fuel flow rate as a function of those sensed conditions. With both systems, the throttle lever may be moved abruptly and the system will automatically adjust the fuel flow rate while maintaining the rate within acceptable predetermined limits.

ing parameters and, in response to the conditions sensed, modified the forces transmitted to the metering valve servo by a mechanical linkage, thereby to limit the fuel flow rate.

The engine-operating parameters employed in the MFC system for controlling fuel flow rate are, like the 1307 system, (a) engine speed, (b) compressor *discharge* pressure, and (c) compressor inlet temperature.[23] Both the '275 Mock patent and the MFC system utilize means for sensing the conditions of the mass of air flowing to and/or through the engine, as a whole, and modifying the fuel flow rate as a function of those sensed conditions.

Finding of fact 32 is dispositive of the issue of infringement, especially since the Edwards and/or Woodward disclosures do not affect the scope of the Mock claims.

32. Both the '275 patent and the MFC system employ mechanisms which regulate fuel flow during steady-state and transient conditions as a function of engine speed and mass air flow. Both have means for limiting the fuel flow during transient conditions within predetermined limits and both have means for sensing the conditions of the mass of air flowing through the engine and modifying the fuel flow rate as a function of those sensed conditions. With both systems, the throttle lever may be moved abruptly and the system will automatically adjust the fuel flow rate while maintaining that rate within acceptable predetermined limits.

F. *Claims 1, 3, and 8:* Claims 1, 3, and 8 define the invention insofar as it relates to control of fuel flow as a function of engine speed and do not, therefore, pertain to the concept of controlling fuel flow by sensing changes in air pressure and/or temperature.

These claims do not include the "means plus function" language of claims 4, 5, 7, 11–14, and 17 with respect to sensing changes in pressure and/or temperature. In view of our conclusion that the latter group of claims have been infringed, it is unnecessary to consider or decide whether claims 1, 3 and 8 have also been infringed. We leave that question open.[24]

### III

### *Kunz patent*

▮▮▮▮ The Kunz invention uses the basic principles of scheduling fuel flow described in the '275 (Mock) patent but employs a number of three-dimensional (3–D) cams that are indexed by signals derived from various engine-operating conditions for controlling the flow. The surfaces of the 3–D cams are contoured as a function of various engine parameters and, in effect, serve to define a boundary condition. Kunz suggested the use of three cams, a deceleration cam, an acceleration cam, and a surge cam. The followers associated with each of the cams are positioned in response to changes in the engine parameters and these followers, cooperating with the indexed surfaces of the cams, position a pair of valve-limiting stops to establish an acceleration, deceleration limit for the control system, thereby avoiding over-temperature during acceleration and engine die-out upon deceleration.

Kunz was the first to employ 3–D cams with the Mock mode of operation to schedule fuel flow during transient conditions. Since then, 3–D cams have been widely adopted in the industry.

Claims 11, 24, 25, and 28 are here in issue with defenses of invalidity in view of the prior art asserted against each of the claims.[25] Of the 26 prior art references

---

**23.** See also note 21, *supra.* The MFC system, unlike Edwards, uses a temperature sensor.

**24.** It will be recalled that we have held the main innovative feature of the Mock patent to be its concept of using speed plus pressure

and/or temperature to monitor fuel flow—a concept lacking in claims 1, 3 and 8.

**25.** Defendant denies infringement and, in addition, claim 28 is asserted to be invalid for noncompliance with § 112, claim 24 is said to be invalid under § 102(e) and claim 24 is al-

noticed by defendant, only four patents and two German translations are now relied upon. Of these, only Davies Patent No. 2,670,599 need be mentioned here since each of claims 11, 24, 25, and 28 is directly readable on the disclosure of that patent.

The Davies patent discloses a fuel control system for scheduling fuel flow during transient conditions to avoid over-temperature and compressor surge. A limit stop, positioned as a function of engine-operating parameters, is employed to limit the movement of the fuel control valve to a metering rate conforming to a predetermined acceptable level of engine acceleration. Davies suggests using various parameters, including engine speed and compressor discharge pressure, to control the position of the limit stop.

Plaintiff's attempts to distinguish Davies on such grounds as the absence of 3–D cams in that disclosure are ineffectual since none of the claims includes a cam of any description in the claimed combination. *Douglas v. United States*, 510 F.2d 364, 206 Ct.Cl. 96, *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975). It is clear that Davies was concerned with the same problem as Kunz and sought to remedy it by a combination of elements that function in the manner specified in these claims. Although there are some differences between Kunz and Davies, those differences do not appear in the claims and, therefore, cannot be considered. The claims being so broad as to read on the combination disclosed in Davies, they cannot be sustained. *Straussler v. United States*, 339 F.2d 670, 168 Ct.Cl. 852 (1964).

### CONCLUSION OF LAW

Upon the findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that (1) claims 11, 24, 25, and 28 of Kunz Patent No. 2,720,-751 are invalid and the petition is dismissed as to that patent, and (2) claims 4, 5, 7, 11, 12, 13, 14, and 17 of Mock Patent No. 2,581,-275 are valid and infringed and defendant is liable for infringement of that patent. Accordingly, plaintiff is entitled to recover and judgment is entered to that effect.

leged to be licensed to defendant. In view of the conclusion reached on the basis of the prior art, it is unnecessary to consider any of these defenses.

The amount of recovery is reserved for further proceedings under Rule 131(c).