Finis Lavell CHISUM, et al., Plaintiffs,

v.

BREWCO SALES AND MANUFACTUR-
ING, INC., et al., Defendants.

Civ. A. No. 84–0013–O(CS).

United States District Court,
W.D. Kentucky,
at Owensboro.

Feb. 1, 1989.

On Motion to Amend Opinion
Nov. 27, 1989.

Ralph W. Wible, Holbrook, Gary, Wible & Sullivan, Owensboro, Ky., Jon Nelson, Allegretti & Witcoff, Ltd., Chicago, Ill., for plaintiffs.

James Tardio, Jarvis, Payton & Kinney, Central City, Ky., M.L. Miller, Harold W. Thomas, Jack A. Wheat, Robert, Miller and Thomas, Louisville, Ky., for defendants.

## MEMORANDUM OPINION AND ORDER

SIMPSON, District Judge.

The Court having heard evidence at the trial of this matter without intervention of a jury, and having considered the briefs and post-trial memoranda, and the Court being otherwise sufficiently advised, makes the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1. This is a patent infringement action.

2. The plaintiff, Finis Lavell Chisum (hereinafter "Chisum"), is an individual residing in Claremore, Oklahoma.

3. Chisum is the owner of U.S. Patent No. 3,630,066 issued December 28, 1971 (the Chisum '066 patent) and U.S. Patent No. 3,888,100 issued June 10, 1975 (the Chisum '100 patent). The Chisum '100 patent was issued by the United States Patent and Trademark Office as U.S. Patent No. Re.31,636 (the Chisum reissue patent or the patent in suit) on July 31, 1984.

4. The plaintiff, Chief Automotive Systems, Inc. (hereinafter "Chief"), is a corporation organized under the laws of Delaware having a principal place of business located in Grand Island, Nebraska.

5. Chief is the exclusive licensee of the Chisum '066, '100 and reissue patents and manufactures several models of automotive frame straighteners under license from Chisum using the trade name "EZ Liner".

6. Chisum completed the EZ Liner prototype in June, 1968. The EZ Liner is a frame-straightening device incorporating the features of the Chisum patent claims.

7. Chisum's invention, for which the patent in suit issued, is a machine for straightening the frames and bodies of cars and similar vehicles after collisions.

8. The Chisum '066 patent is not now alleged to have been infringed by the defendants nor is it otherwise involved in this lawsuit.

9. The claims of the '100 patent, not found to be invalid by the Patent and Trademark Office during the reissue proceedings (as indicated by the unbracketed claims contained in the reissue patent) and of the reissue patent which are alleged to be infringed in this action are Claim 1, being an independent claim, and all of the claims dependent either directly or indirectly upon Claim 1.

10. Defendant, Clarence W. Brewer (hereinafter "Brewer"), is an individual residing in Central City, Kentucky.

11. Defendant, Brewco Sales and Manufacturing, Inc. (hereinafter "Brewco"), is a corporation of Kentucky having its principal place of business located in Central City, Kentucky.

12. Brewer is President and principal stockholder of Brewco. He is responsible for total management and operation of the corporation. His wife and son are the only other shareholders in this company.

13. Brewco has been building automotive frame-straightening machines since 1983.

14. Brewco was formed specifically for the purpose of making frame-straightening apparatus.

15. Brewer has been building machinery of various types for some 20 years. He worked in his father's sawmill in his early years, and dropped out of school in the tenth grade. He then worked as a forklift operator as the mill until taking over its management at the age of 19. During these years, he built hydraulically operated woodworking machinery for the mill such as cutoff saws and gangsaw planers.

16. In 1968, Brewer and his father bought a stock car race track and Brewer and a friend began repairing stock car frames and suspensions.

17. In 1978, Brewer entered the salvage business and started buying and doing body work on wrecked cars.

18. In April, 1979, Brewer rented and later purchased a Chief EZ Liner frame-straightening machine.

19. In 1983, Brewco built its first frame-straightening machine.

20. Brewer used this machine at his salvage yard for under a year.

21. Brewer sold his EZ Liner to another body shop in 1984.

22. Brewer's first frame-straightening machine was called the "Brew–Liner", and has been referred to throughout this lawsuit as "Machine No. 1". (PX–78, p. 1).

23. It is admitted by Brewer that Machine No. 1 is a substantial copy of the Chief EZ Liner machine that he had previously purchased from Chief.

24. Only one such machine of the Machine No. 1 type was built by Brewer. It was completed in August or September of 1983.

25. In November, 1983, Brewer attended the National Automobile Association Show in Nashville, Tennessee. Brewer showed his Brew–Liner brochure to Carl Fields, the owner of the Does More Corporation, who was displaying a frame-straightening machine. Fields informed Brewer that he had been involved in litigation with Chief. He warned Brewer that he was going to have problems with the way he had constructed his towers in his Brew–Liner machine.

26. Brewer had redesigned the pull towers of his Machine No. 1 in December, 1983. The new pull tower design was incorporated into what became Brewco's Machine No. 2. (PX 78, p. 2). He manufactured a Machine No. 2 that was operable but was not in use at the time he was served with notice of his infringement, on January 23, 1984.

27. January 20, 1984, counsel for Chisum, James Head, notified Brewco by letter that in his opinion Machine No. 1 constituted a direct infringement of the Chisum patent rights and that he had filed the lawsuit thereon. He indicated that settlement offers would be considered.

28. On January 23, 1984, Brewer was served with notice of Chisum's patent infringement lawsuit against him.

29. On January 24, 1984, Brewer contacted James Tardio, his general counsel, concerning the suit. Tardio advised Brewer to retain a patent attorney.

30. Brewer discussed the suit and his Machine No. 2 with Homer Smith. Brewer sent Smith certain Chief literature and photographs of the Brewco Machine No. 2. He explained to Smith by telephone how the arm or the lever in the tower operated. Smith was not retained by Brewer for the litigation.

31. Brewer contacted and retained Warren Flackbert as patent counsel in February, 1984. Flackbert received copies of the Chisum patent, photographs, sketches and other information for his review.

32. Flackbert was of the opinion that Machine No. 1 infringed the Chisum patent.

33. Flackbert studied the case over the course of four or five months. In March, 1984, Flackbert orally indicated his opinion that Machine No. 2 did not infringe the Chisum patent. This was not a formal opinion. On April 10, 1984, Flackbert wrote Brewer a letter withdrawing as counsel from the litigation and indicating that at this point it was his opinion that Machine No. 2 did not infringe but that he did not like to render opinions on hunches. He indicated that Brewer's impatience to

proceed might later become a burden to him.

34. Flackbert informed Head by letter dated February 13, 1984, that Machine No. 1 would be destroyed.

35. In his February 17, 1984, letter, in response to Flackbert's February 13, 1984 letter, Head stated that he understood the February 13th letter to represent that Brewco had built only the single prototype pictured in the brochure. Head indicated that if this was the case, and Brewco would agree to being enjoined from manufacturing or offering such machines for sale, that the lawsuit could be settled. As a condition of settlement, Head demanded, on behalf of Chisum, $15,000.00 lost profits and royalties, or in the alternative the destruction of the machine.

36. On February 28, 1984, Flackbert wrote Head that the prototype body straightening machine illustrated in the Brewco brochure was not to be used or sold and would be dismantled so as to avoid any alleged infringement. He stated that he trusted this would satisfy Head's request.

37. On April 2, 1984, Flackbert sent Head a Stipulation for Dismissal requesting that the document be executed by him, on behalf of Chisum and Chief.

38. Flackbert was aware of the existence of Machine No. 2 when he sent the Stipulation of Dismissal to Head.

39. On April 6, 1984, Head wrote Flackbert requesting clarification of Flackbert's assertion that the machine would be "dismantled", and stated that he would require further explanation if Brewco intended to make certain modification to the machine.

40. On April 10, 1984, Flackbert wrote Brewer that he would comply with Brewer's request that he withdraw as counsel from the case. He indicated to Brewer that on Brewer's behalf, Flackbert's goal had been to have the action dismissed and kept apart from any possible conflict with Machine No. 2. He noted that if an answer was filed in the case Chisum's attorney could proceed with discovery and that the

Machine No. 2 version might become known.

41. Brewer withheld the information concerning Machine No. 2 from Head.

42. On April 12, 1984, Head wrote Flackbert concerning some additional advertising by Brewer which Chisum had discovered. Head sought an assurance that Brewco would not be in the business of manufacturing, selling or leasing frame-straightening machines as he advertised. Head suggested deposing Brewer to establish exactly what had occurred and what Brewer planned to do in the future. The letter was forwarded to Tardio who had taken over the negotiations from Flackbert.

43. On April 13, 1984, Tardio wrote Head that Brewer was no longer manufacturing or using the machine in question and that the machine had been dismantled, destroyed and made useless for any purpose other than scrap metal.

44. On April 18, 1984, Tardio wrote Head that the advertisement referenced in Head's letter of April 12, 1984, was a publishing error and that the machine had been destroyed. He stated that a deposition of Brewer seemed a needless waste of money and time.

45. On April 18, 1984, Head signed the Stipulation of Dismissal on behalf of Chisum and Chief. On April 23, 1984, Tardio signed the stipulation on behalf of Brewer and Brewco. The stipulation was not filed with the Court.

46. On April 30, 1984, Head wrote Tardio that he had been informed that Brewer had three machines that he had built ten months earlier to improve on the Chief EZ Liner and that Brewer had represented to persons inquiring that he was preparing to sell them. Head requested that the stipulation not be filed until these matters were resolved.

47. Brewer built seven No. 2 machines. He sold two No. 2 machines in May, 1984. He built the last Machine No. 2 about mid–1984.

48. Brewer manufactured his first Machine No. 3 in mid to late 1984. (PX 78, p. 3).

49. In designing Machine No. 3, Brewer utilized a closed oval platform so that he could rotate the tower all the way around the vehicle. Brewer had seen the patent to Latuff which utilized an oval track.

50. Brewco sold the last of its seven No. 2 machines in mid–1985, after sales of Machine No. 3 had commenced.

51. Flackbert reviewed Brewer's design for Machine No. 3 and rendered his opinion that Machine No. 3 would not infringe the Chisum patent. Flackbert told Brewer to proceed with production of Machine No. 3. Flackbert never rendered a written opinion concerning potential infringement by Machine No. 3.

52. Brewco had built 86 No. 3 machines through the date of trial, of which 80 had been sold and six were still on hand.

53. Brewco built an "Add–A–Tower" unit which consists of a mountable pull tower identical to the pull towers of Brewer's Machine No. 3.

54. Brewco had built eleven Add–A–Tower units through the date of trial, of which nine had been sold and two were still on hand.

55. The Chisum Reissue Patent: Claim 1 of the Chisum reissue patent states what is claimed:

1. Apparatus for applying equal and opposite forces to a mechanical structure such as an automotive vehicle body or frame comprising:

a. A platform system;

b. Means on said platform system for supporting said structure;

c. At least one vertical pull tower means pivotally connected about a vertical axis fixed to said platform system rotatably moveable to a desired position relative to said structure;

d. Means to vertically elongate said tower;

e. Means to connect a tension member between said vertically elongate means and a first portion of said structure to apply a first force to said structure; and

f. Means to apply a second force between a second portion of said structure and said platform system.

56. Defendants' Exhibits 4–16 and 25–28 consist of certain patents admitted into evidence which have filing dates prior to the date Chisum made his invention, and the parties agree that these patents are prior art to the Chisum reissue patent.

57. The system disclosed in the reissue patent allows the user to make a direct pull on the vehicle at a desired angle by aligning the tower and the swivel collar. The ultimate application of power by means of a hydraulic cylinder was well known in the art; however, this system is different in its application of the hydraulic force.

58. In ascertaining the teachings of a patent, the total structure of the patent must be considered.

59. The purpose of the hydraulic cylinder used in the Chisum design is to put tension on the chain, by connecting the chain to a cylinder through a pulley system which is pivotally connected to the tower and then hooked onto the vehicle, the hydraulic force pulling the rod into the cylinder. The result of the action in the Chisum machine is tension on the chain as it comes out of the pulley at the tower, applying a force to the vehicle.

60. Machine No. 1 contained all structural and functional elements disclosed by the reissue patent.

61. The vertical pull tower means of Machine No. 1 consists of the vertical post, piston, push rod and the attachments to the supporting structure. The horizontal arm is not a part of the vertical pull tower means, but is a part of the platform system and the operation of the machine.

62. The primary motion in elongation in Machine No. 1 is the action of the hydraulic cylinder; the secondary motion is the telescoping movement of the upper section of the vertical post of Machine No. 1.

63. Machine No. 2 contains a platform system, including the substructure and treadway which support a vehicle and the towers.

64. Machine No. 2 contains a means on the platform system for supporting a vehicle which consists of the treadway structure.

65. Machine No. 2 has at least one vertical pull tower means attached to the platform. The pull tower means is pivotally connected to the platform system and is pivotal and rotatably moveable about a vertical axis. It can be moved to a desired position but not to any desired position.

66. Machine No. 2 has a means to elongate which is the hydraulic cylinder with push rod.

67. Machine No. 2 has a tension member which is a chain. It connects from a hook, goes over several rollers, and connects to a bar back to the hydraulic cylinder and push rod.

68. Machine No. 2 has a means to connect the tension member between the vertically elongate means and the automobile which is a hook on the end of the chain, the pulley which is connected by a swivel and a collar to the tower, two pulleys and a rod connecting the chain to the push rod of the hydraulic cylinder.

69. Machine No. 2 contains a means to apply a second force between the platform system and the vehicle which consists of additional towers to apply a second force and additional apparatus to connect the vehicle to the platform system.

70. Machine No. 2's movement of the push rod downward instead of upward does not affect the operation. From a mechanical engineering standpoint it is the identical motion.

71. In Machine No. 2, the structural height of the vertical pull tower means does not change but the functional depth increases.

72. The pivotal rod utilized in Machine No. 2 takes the function of the cap, or telescoping top piece in Machine No. 1.

73. Vertical elongation upward and downward are functionally indistinguishable.

74. Machine No. 3 contains a platform system which consists of a racetrack-shaped track, semicircular at both ends, with a treadway system to support a vehicle.

75. Machine No. 3 contains a vertical pull tower which is attached to the platform system's track by rails with sliding or rolling members.

76. The tower of Machine No. 3 moves around the platform on the track, moving in a circular path about the vertical axis defined by the semicircular shape of the track at each end. The vertical axes at each end of the platform are fixed insofar as the shape of the track which defines them never changes.

77. The Machine No. 3 tower is not pivotally connected about a fixed axis when moved along either linear rail. The Machine No. 3 tower, moved within either semicircular end of the track, is then pivotally connected about a fixed axis.

78. Machine No. 3 does not have a means to vertically elongate its pull tower.

79. Machine No. 3 utilizes a hydraulic cylinder with push rod which is mounted in the platform system.

80. From a mechanical engineering standpoint, Machine No. 3 performs the same work as the Chisum machine. The hydraulic cylinder tightens the chain which is run through a pulley, swivel point and second pulley on a collar and is hooked to the vehicle. This system, from a mechanical engineering standpoint, constitutes an equivalent structure in Machine No. 3 to a means to vertically elongate the tower.

81. Machine No. 3 has a tension member which is a chain.

82. Machine No. 3 has a means to connect the push rod to the vehicle by connecting the chain to the push rod, passing it through a pulley directing the chain vertically upward and over a second pulley and swivel connected to a collar on the tower and attaching to the vehicle by a hook.

83. Machine No. 3 has a means to apply a second force to a vehicle consisting of additional towers to apply a second force and additional apparatus to tie the vehicle to the platform.

84. From a mechanical engineering standpoint, when the Machine No. 3 towers are at the ends of the platform the machine performs substantially the same work as Chisum's machine. Though the pull tower means is not structurally attached at the vertical axis, as Chisum's pull tower means is attached by an arm, the pull tower means pivots about the same axis point fixed to the platform at the semicircular ends.

85. The Add–a–Tower unit is attached to a small platform by a pin which allows the tower structure to rotate over the pin in a circular motion. The platform is rigidly tightened onto the platform system.

86. The Add–a–Tower unit can only be used in conjunction with a platform system.

87. Brewer has sold and continues to sell has Add–a–Tower as an attachment for platform system frame-straightening machines.

88. Brewer was not aware that the Chief EZ Liner machine bears a patent notice in the form of a label on the machine.

89. Brewer was first aware of the existence of the reissue patent in late 1983.

90. The Weaver patent does not disclose a hydraulic system.

91. The Chartier patent discloses a hydraulic jack to extend a chain and pull on it. It does not contain a platform system.

92. The patent to Eck discloses a hydraulic cylinder mounted outside the vertical post which pushes on a lever to tighten a chain. The functional operation is not affected by the mounting of the cylinder on the outside rather than the inside of the vertical post. The tower has a finite number of adjustments that can be made to achieve a finite number of angles of pull.

93. The patent to Dobias discloses a rotatable collar on a frame-straightening device. It does not have all of the components of the Chisum pull tower assembly.

94. The (Exhibit 15) patent to Latuff discloses a platform system and a superstructure around the platform system anchored to the platform and attached to the floor. The pulling means travels along a track in a linear pathway at the sides and ends and along a circular pathway at the four corners.

95. The patent to Transue discloses pull towers with slidable collars. The collars are only adjustable vertically to a finite number of levels. The patent discloses use of a hydraulic cylinder to accomplish chain tightening. The device does not employ a complete platform system and would require many tie-downs of the vehicle for each pull.

96. The (Exhibit 11) patent to Latuff discloses a platform system which is anchored to the building. The geometry of the Latuff platform is similar to Machine No. 3—it is racetrack-shaped. The pull tower of the Latuff machine travels in a linear path on the sides and in a circular path at the ends of the track. The tower in Latuff is elongatable by hand, lifting the pull tower up and moving the pins. It requires two persons to change the height of the tower.

97. Chief holds the only license on the reissue patent.

98. Chief negotiated its license under the reissue patent in 1972, for a relatively unknown, untested product.

99. The fixed license rate paid by Chief to Chisum is $500.00 per unit, for a minimum of 500 units per year.

100. Based upon the historical numbers concerning market success, cost of production, and percentage of profit made by Chief, a hypothetical licensee could pay $6,500.00 per unit and yield a 10 per cent profit on its sales.

101. The licensee would benefit from Chief's national advertising and training and service facilities, making costs lower for the licensee.

102. Joint Exhibit 3 admitted into evidence consists of the November 21, 1986 prospectus for Chief, the data pertinent to calculation of lost profits on the Chief EZ Liner systems appearing on pages 7 and 12.

103. A per unit gross profit figure for the years 1984, 1985 and 1986 can be calcu-

lated by dividing the total gross profit dollars by the number of units installed, assuming that selling price and cost remain constant within each year:

1984—$16,584.00 per unit

1985—$17,351.00 per unit

1986—$20,726.00 per unit

104. The majority of Chief's selling, general and administrative expenses are of a fixed nature. There would be very little additional costs incurred from selling 94 additional units.

105. The testimony and documentation concerning lost profit for the years 1987 and 1988 is incomplete and is inaccurate due to the passage of time since trial. The Court therefore makes no findings of fact concerning damages for the years 1987 and 1988 at this time.

106. A lost profit per year figure can be calculated by multiplying the per unit gross profit by the number of units Brewco sold or had on hand in each year.

107. Brewco's answers to interrogatories indicate that it sold or had on hand:

1984—10 machines (7—No. 2 and 3—No. 3)

1985—25 machines (No. 3)

1986—33 machines (No. 3)

1987—26 machines—to the date of trial (No. 3)

Chief's lost profit per year:

1984—$165,840.00

1985—$433,775.00

1986—$683,958.00

108. The uncontradicted trial testimony established that the per unit gross profit on sales of its accessory tower unit was:

1986—$1,370.00 per unit

1987—$1,625.00 per unit

109. Brewco's answers to interrogatories indicate that it sold or had on hand:

1986—4 Add–a–Tower units

1986—7 Add–a–Tower units

110. Brewco's answers to interrogatories indicate that two of the Add–a–Tower units were items it had on hand.

111. Chief's lost profit on its accessory tower for 1986 was $5,480.00. The figures for 1987 and 1988 being incomplete, the Court will not presently find any facts concerning Chief's lost profits on its accessory tower for those years.

## II. CONCLUSIONS OF LAW

Manufacture, use, or sale of a patented invention, without authority in the United States during the term of the patent, constitutes infringement of the patent. 35 United States Code § 271(a).

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

■ The plaintiff bears the burden of proving infringement by a preponderance of the evidence. *Roberts Dairy Co. v. United States*, 530 F.2d 1342, 1357, 208 Ct.Cl. 830, 198 U.S.P.Q. 383 (Trial Div., 1976), affirming and adopting 182 U.S.P.Q. 218, 227 (Trial Div., 1974); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361, 219 U.S.P.Q. 473 (Fed.Cir.1983).

■ Analysis of patent infringement entails two inquiries: determination of the scope of the claims, as a matter of law; and the factual finding of whether properly construed claims encompass the accused structure. *Mannesmann Demag. Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282, 230 U.S.P.Q. 45, 46 (Fed.Cir. 1986). This analytical framework applies whether claims are asserted to be infringed literally or by application of the doctrine of equivalents. *Texas Instruments, Inc. v. United States International Trade Comm.*, 805 F.2d 1558, 1562, 231 U.S.P.Q. 833 (Fed.Cir.1986).

The Chisum reissue patent is not a pioneer patent; however, the advancements made by Chisum did constitute substantial steps in the frame-straightening art.

The validity of the Chisum patent is not challenged in this action. The reissue patent has survived a validity challenge in *Square Liner 360° v. Chisum*, 691 F.2d 362, 216 U.S.P.Q. 666 (8th Cir.1982). The invention of Claims 1 and 33 and the claims dependent thereon were held to be unobvious to a person of ordinary skill in the art at the time the invention was made.

There must be something in the prior art as a whole to suggest the desirability and thus the obviousness of making the combination. Not only must the claimed invention as a whole be evaluated, but so also must the references as a whole, so that their teachings are applied in the context of their significance to a technician at the time—a technician without our knowledge of the solution.

*Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 227 U.S.P.Q. 543 (Fed.Cir.1985).

The fact that the claims were found to be unobvious constitutes some evidence in support of a finding of substantial advancement in the art.

■ Although the effect of the prior art on the scope of the claims in suit is to be considered, the approach of the Court should not be a "camouflaged or backhanded attack" on the validity of the patent. Where validity in view of the prior art has not been challenged, the Court is less free to limit the application of the doctrine of equivalents than where invalidity is specifically urged by the alleged infringer. *Thomas v. Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir.1983), citing *Bendix Corp. v. United States*, 600 F.2d 1364, 1373, 220 Ct.Cl. 507, 204 U.S.P.Q. 617, 624 (1979). The Court must look to the prior art to distinguish what previously existed in the frame-straightening art from what Chisum claims is the new and advantageous result his invention has achieved. The prior art to the reissue patent consists of:

| | |
|---|---|
| Patent to Gingrich, et al | No. 2,563,527 |
| Patent to Weaver | No. 2,606,670 |
| Patent to Elam | No. 2,674,293 |
| Patent to Fagan | No. 2,792,046 |
| Patent to Howick | No. 2,705,040 |
| Patent to Dobias | No. 2,717,020 |
| Patent to Marquardt | No. 3,088,513 |
| Patent to Bronson, et al | No. 3,122,194 |
| Patent to Smith | No. 3,149,660 |
| Patent to Transue | No. 3,276,237 |
| Patent to Latuff, et al | No. 3,269,169 |
| Patent to Bronson, et al (Canadian) | No. 697,873 |
| Patent to Mason (Australian) | No. 249,933 |
| Patent to Chartier | No. 3,340,720 |
| Patent to Eck | No. 3,338,083 |
| Patent to Latuff, et al | No. 3,377,834 |
| Patent to Rouis | No. 3,518,867 |

■ Claim 1 of the reissue patent is the representative claim alleged to be infringed, thus the prior art must be distinguished from the reissue patent in light of those elements found in Claim 1. The range of equivalents depends on the extent and nature of the invention. If the invention is broad or primary in character, the range of equivalents will be correspondingly broad. *Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); *see also Julien v. Gomez & Andre Tractor Repairs, Inc.*, 438 F.Supp. 763, 196 U.S.P.Q. 224 (M.D.La.), *affm'd.* 607 F.2d 1004 (1979). The scope of the prior art has been defined as that reasonably pertinent to the particular problem with which the inventor was involved. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535, 218 U.S.P.Q. 871 (Fed.Cir.1983), citing *In Re Wood*, 599 F.2d 1032, 1036, 202 U.S.P.Q. 171, 174 (Cust. & Pat.App.1979); *Weather Engineering Corp. of America v. United States*, 614 F.2d 281, 222 Ct.Cl. 322, 208 U.S.P.Q. 939 (1980).

The Latuff patent, No. 3,269,169, employs structural elements similar to those found in Claim 1 of the reissue patent; however, the reissue patent teaches elements d and e to require elongation of the tower by means of a mechanical device such as a hydraulic cylinder. Such elongation of the tower results in chain tightening; application of a first force to the vehicle. Latuff, on the other hand, employs an elongatable tower which must be adjusted by hand and employs locking pins to hold the tower at the desired height. A cable is passed over a pulley at the top of the tower and is tightened by hydraulically activated rotation of a winding drum. Latuff taught a much more primitive combination with less versatility than the Chisum patent. The Latuff device did not provide much versatility to create pulls from desired angles. Chisum utilized a combination of a rotatably moveable tower with a series of vertically and horizontally adjustable pulley and collar fittings in order to achieve pulls at a desired angle. An invention must be considered "as a whole". 35 U.S.C. § 103. The mobile units which utilized hydraulic pull in tower components which had to be mounted or fixed in relation to the separate platform for each pull

were cumbersome to use and required a great deal of setup and breakdown time.

Though many of the features of the claims are old and an organization was shown in somewhat primitive form, to consider the machine as a mere combination of earlier concepts with more modern mechanical components is to "ignore matters of substance". The Chisum machine is a structure which gave a "new result and a new unitary mode of operation of the entire machine." *See Williams Mfg. Co. v. United Shoe Mach. Corp.*, 121 F.2d 273, 50 U.S.P.Q. 624 (6th Cir.) *affm'd.* 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942). In *Williams,* supra, the Court held that where an invention achieved a marked improvement in the art, the test for patentability permits consideration of the improved results as a factor. The invention was patentable, even though the combination of elements did not involve a different operation or cause the machine to serve a different purpose. The new patented combination did achieve a new result. It significantly enhanced the usefulness of the device and solved an important problem for the shoe manufacturing industry. All of the elements claimed in the patent cooperated to accomplish the result. Hence the combination was patentable. *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 586 F.2d 917, 922, 199 U.S.P.Q. 641 (2nd Cir.1978), *cert. denied* 440 U.S. 961, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979).

■ Patentability having been established in the *Squareliner* litigation, the question then becomes the degree to which Chisum's combination advanced the frame-straightening industry. The new result achieved by Chisum was efficient and versatile operation. No single patent disclosed the coordinated concept of hydraulic chain tightening in a unitized system with the type of tower mounting and system of pulleys and collars found in the Chisum device which allows the user to accomplish pulls at various angles quickly and easily. The reissue patent teaches a much-improved form of frame-straightening machine. The system is unitized, free-standing, and mobile, in contrast to the Latuff machine which requires anchoring in the floor, or the Rouis machine which requires assembly of the separate components for each pull. Though the prior art reveals uses of hydraulic cylinders to accomplish chain tightening, no other patent discloses such use in a unitized system. The Chisum patent possesses a "synergistic effect such that the whole is greater than the sum of the parts." *TWM Mfg. Co. v. Dura Corp.,* 722 F.2d 1261, 1267, 221 U.S.P.Q. 25 (6th Cir.1983) *cert. denied* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986); *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 370, 195 U.S.P.Q. 402 (6th Cir.1977). The Chisum machine achieved great commercial success. No prior art patent integrated the concepts found in the prior art in such a way as to achieve ease of movement, speed of setup and versatility for the application of the pulling force at a desired angle. Objective evidence of non-obviousness includes commercial success, long-felt but unresolved need, failure of others, and copying. When present, such objective evidence must be considered. *Custom Accessories,* citing *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 228 U.S.P.Q. 90 (Fed.Cir.1986).

Patents which make a substantial contribution to an already established art may receive similar treatment [Treatment similar to that given to pioneer patents]. In administering the patent law, the Court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the Court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the borderline between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in approximate copies of the new device. It is this differing attitude of the courts toward genuine discoveries and slight improvement that reconciles the sometimes apparently conflicting instances of construing specifica-

tions and the finding of equivalents in alleged infringements.

*Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923).

■ The *Eibel* case held that Eibel made a very useful discovery which advanced the art. Though his was not a pioneer patent, creating a new art, his improvement on an old machine was found to be very meritorious and entitled to liberal treatment. The rationale of *Eibel* was reaffirmed in *Julien v. Gomez & Andre Tractor Repairs, Inc.*, supra. The reissue patent is entitled to liberal construction insofar as it significantly advanced the developing frame-straightening art, was a non-obvious combination of elements found in the prior art, solving the problems of lack of versatility and extensive commitment of time which plagued the industry.

Machine No. 1 was admitted to be a copy of the Chief EZ Liner. The Court finds that Brewco Machine No. 1 literally infringes the Chisum reissue patent inasmuch as the claims of the patent read directly on the accused machine.

■ There was no settlement of the infringement claims against Machine No. 1. The negotiations for settlement depended upon the representations made by Flackbert, counsel for Brewer and Brewco, to Head, counsel for Chisum and Chief, on February 13, 1984, that except for the single Machine No. 1, no other body-straightening machine had been manufactured or sold. Head's response to Flackbert's February 13th letter stated that if Brewer built only the single prototype pictured in the brochure then a settlement could be reached. During the period of settlement negotiations Brewer was designing his Machine No. 2 for manufacture. Brewer and his agents deliberately withheld information concerning his activities from Chisum and Chief. Head made known his concerns that Brewer was continuing to manufacture frame-straightening machines and when he became convinced that the situation had been misrepresented to him, he requested that the Stipulation of Dismissal of the lawsuit not be filed. In fact, it was never filed with the Court. The Stipulation of Dismissal is ineffective. The dismantling of the single Machine No. 1 would have constituted consideration for settlement of the matter had the dismantling been done under the required circumstances.

Head's agreement to negotiate for settlement was contingent upon certain conditions which were later found not to exist. There was no binding agreement between the parties to settle the dispute.

Machine No. 2 was admitted to employ structural elements a, b, c, and f of Claim 1. Element d states a means with a corresponding function. An element in a claim for a combination may be expressed as a means or a step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claims shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. 35 U.S.C. § 112. Machine No. 2 has a means to vertically elongate the element c pull tower means. The vertical pull tower means of element c consists of a vertical cylindrical pull tower structure and rigidly mounted hydraulic cylinder in that tower which employs an extensible rod moveable in a downward direction. The energized cylinder forces the rod downward, extending the length of the pull tower means in a vertical direction. The hydraulic cylinder in Machine No. 2 is an equivalent means which performs the function of the hydraulic cylinder taught in the Chisum reissue patent, there being no mechanical distinction between vertical movement of the rod upward and downward. The structural length the pull tower means changes, e.g., elongates, with the extension of the rod.

The element e "means to connect a tension member between the vertically elongate means and a portion of the structure to apply a first force" is embodied in Machine No. 2 as a system of pulleys, collars and hooks which allow a chain to be attached to the damaged portion of the vehicle, the chain being passed over the top of the outer tower structure and hooked to

a lever. The lever is mounted at one end to the horizontal arm at the base of the pull tower structure and moves freely outside the tower at the other end. The chain is attached to the freely moving end of the lever. When the energized hydraulic cylinder elongates the vertical pull tower means, as described in the element d analysis, the extensible rod is forced downward, in turn forcing the lever downward, which results in chain tightening. Utilization of a lever between the extensible rod and the chain does not alter the function. Chain tightening is accomplished when the rod is extended in a downward direction, the lever bringing the elongatable pull tower means into contact with the chain.

The Chisum device employs cylindrical vertical members on which adjustable collars are placed. A pulley is rigidly mounted to the collar. The collar can be adjusted to accommodate a desired angle of pull by sliding vertically or by rotating the collar on the cylindrical member. The vertical members of Machine No. 2 are square, rather than cylindrical, thus rotation of the collar on the member is precluded. However, Machine No. 2 employs a pivot pin where the pulley attaches to the collar, thus the pulley can be adjusted horizontally as well as vertically, just as accomplished in the Chisum device. Machine No. 2 possesses an equivalent element e means which performs the functions stated in element e.

 If properly construed claims read on the infringing product, there is literal infringement. *Atlas Powder Co. v. E.I. duPont DeMours*, 750 F.2d 1569, 1579, 224 U.S.P.Q. 409 (Fed.Cir.1984), citing *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 U.S.P.Q. 1137, 1140 (Fed.Cir.1983). Where the accused devise includes a means that is equivalent and that performs the function of that means, the additional elements of the claim being found, the claim would read directly on the accused device and constitute literal infringement. *See DMI, Inc. v. Deere & Co.*, 755 F.2d 1570, 225 U.S.P.Q. 236 (Fed. Cir.1985). The claims of the reissue patent read directly on Machine No. 2. Machine No. 2 literally infringes the Chisum reissue patent.

 Machine No. 3 infringes the Chisum reissue patent under the doctrine of equivalents. The essence of the doctrine of equivalents is that one may not practice a fraud on a patent. A patentee may invoke this doctrine to proceed against the producer of the device if it performs substantially the same function in substantially the same way to obtain the same result. The theory on which it is founded is that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. *Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), citing *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 citing *Union Paper–Bag Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935 (1877). A finding of equivalents is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the the technology; by documents, including texts and treatises; and by the disclosures of prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. *Graver Tank & Mfg. Co.*, supra at 610–11, 70 S.Ct. at 857–858. Machine No. 3 is admitted to employ structural elements a, b, and f of Claim 1 of the reissue patent.

Machine No. 3 employs "at least one vertical pull tower means pivotally connected about a vertical axis fixed to said platform system rotatably moveable to a desired position relative to said structure," as claimed in element c of the reissue patent. The vertical pull tower means of Machine No. 3 travels on an oval track around the vehicle. At each end of the track the pull tower means is rotatably moveable to a desired position relative to the vehicle. The pull tower means is fixed to the platform system and, at the ends, the pull tower means pivots about a vertical axis fixed to the platform system, the vertical axis being defined by the arc through

which the tower travels on the track. "... A machine that infringes part of the time is an infringement although it may at other times be so operated as not to infringe." *Wright Co. v. Herring–Curtiss*, 211 F. 654, 655 (2nd Cir.1914).

Machine No. 3 does not employ a means to vertically elongate the vertical pull tower means as claimed in element d of Claim 1. The machine cannot therefore employ a means to connect a tension member between the vertically elongate means and the vehicle since the Machine No. 3 does not employ a vertically elongate means.

Machine No. 3 performs substantially the same function in substantially the same way to achieve the same result, thus it infringes the reissue patent under the doctrine of equivalents.

The changes made in the design of Machine No. 3 distinguish it structurally from the Chisum device. However, there is no distinction in the work by the two machines. Machine No. 3's design embodies the unique attributes of the Chisum device.

Machine No. 3 utilizes a system of pulleys, collars and hooks which is equivalent to that claimed in the reissue patent. The vertical member of the pull tower structure is square. The pulley/collar unit, similar to that found in Machine No. 2, has the adjustability and versatility which is taught in the reissue patent.

The chain of Machine No. 3 passes over a pulley/collar unit on the upper portion of the tower structure. The hydraulic cylinder which tightens the chain is not a part of the vertical pull tower means. It is rigidly mounted in the horizontal arm which affixes the pull tower unit to the platform. The chain is passed down the side of the tower and over a pulley at the horizontal arm which allows the chain to be attached to the horizontally-mounted hydraulic cylinder. When the cylinder is energized, the rod is pulled horizontally into the cylinder and chain tightening results. The vertical pull tower means does not elongate. There is no change in the structural height; however, the work done by the system is identical to the work done by the Chisum device. The angle of pull can

be achieved by movement of the tower structure, collar and pulley, then applying a hydraulic force to the aligned chain. The hydraulic cylinder of Machine No. 3 uses a pulling force. Pulling and pushing forces by a hydraulic cylinder are functionally identical. The rod pulls the chain in a horizontal direction at the point where the rod and chain connect. The change in direction of pull, accomplished by the horizontal mounting of the cylinder and use of a pulley which changes the direction the chain is guided, does not affect the work performed by the unit.

Machine No. 3 performs the same work in substantially the same way and employs the unique features which the Chisum patent defines and this lawsuit seeks to protect. Machine No. 3 infringes the Chisum reissue patent under the doctrine of equivalents.

The Add–a–Tower unit consists of a single Machine No. 3 vertical pull tower unit which can be mounted to the user's frame-straightening machine and hooked into its power source. The unit consists of an identical vertical pull tower structure with pulley and collar fittings, chain and horizontal arm with a hydraulic cylinder rigidly mounted in a horizontal position inside it. The arm is attached to a base by a pivot pin which allows the pull tower unit to be moved in an arc around the pivot pin. The base rigidly mounts to the platform of a frame-straightening machine. When the Add–a–Tower unit is used, its operation with the user's frame-straightening device is infringing. The Add–a–Tower is not usable in any manner other than in conjunction with a frame-straightening machine because its configuration is such that it must be bolted to the platform and hooked to the machine's system to be operational. Once the Add–a–Tower is bolted in place, it operates in the same manner as Machine No. 3 and thus infringes under the doctrine of equivalents for the same reasons that Machine No. 3 was found to be an infringing device.

 Title 35, United States Code, Section 271(b) states that "whoever actively induces infringement of a patent shall be

liable as an infringer." Though Brewco's Add-a-Tower, standing alone, does not constitute an infringing device, the sale of the unit to be added to a platform system frame-straightening machine constitutes inducement of infringement. "... A combination patent protects only against the operable assembly of the whole and not the manufacture of its parts.... A patent on a combination is a patent on the assembled or functioning whole, not on the separate parts." *Deep South Packing Co. v. Laitram Corp.*, 406 U.S. 518, 529, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273 (1972). Active inducement and actual infringement by the induced individual must be shown to prove a violation of 35 U.S.C. § 271(b). *See Power Lift, Inc. v. Lang Tool, Inc.*, 774 F.2d 478, 227 U.S.P.Q. 435 (Fed.Cir.1985). Active inducement has been shown through Brewco's sales brochure for the Add-a-Tower which instructs as to the Add-a-Tower's sole use. Active inducement is also shown by Brewco's sales of the Add-a-Tower. Insofar as there can be no other use but an infringing use, the reasonable inference may be drawn that actual infringement by the purchasers of the Add-a-Tower has occurred. The defendants can only be held liable for the Add-a-Tower units actually sold, since manufacture of the unit is not sufficient to constitute infringement.

■ Brewer is personally liable, along with his corporation, for the infringements in this case. He is the President and principal stockholder of the corporation and is responsible for its total management and operation. Brewer personally designed all three machines and the Add-a-Tower unit. Brewco manufactures the products that Brewer designs. "... Section 271(b) ... may include liability of corporate officials who actively aid and abet their corporations infringements." *Power Lift, Inc.*, supra.

The plaintiffs' expert's calculation of lost profits, derived from the total gross profits figures found in Chief's prospectus is an acceptable means of approximating the damages suffered by the plaintiffs.

The incremental income approach to the computation of lost profits is well established in the law relating to patent damages [citations omitted]. The approach recognizes that it does not cost as much to produce unit $N - 1$ if the first $N$ (or fewer) units produced have already paid the fixed costs. Thus fixed costs—those costs which do not vary with increases in production such as management salaries, property taxes, and insurance—are excluded when determining profits.

*Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22, 223 U.S.P.Q. 591 (Fed.Cir.1984).

■ The plaintiffs have shown entitlement to an award of lost profits in this case insofar as they have shown a reasonable probability that, in the absence of Brewer's infringement, Chief would have sold the additional machines. *See Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 222 U.S.P.Q. 654 (Fed.Cir.) *cert. denied* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984). Chief had the manufacturing and marketing capabilities to accommodate such an increase in sales, and in light of other machines in the industry, it had remarkable success. Chief's damages have been adequately proved.

> "... While the damages may not be determined by mere speculation or guess, it will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

*Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065, 219 U.S.P.Q. 670 (Fed.Cir. 1983) citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

■ The sum of $6,500.00 will be awarded as a reasonable royalty for the manufacture and use of Machine No. 1. The royalty paid to Chisum under his license agreement with Chief is not a reasonable figure upon which a "reasonable royalty" can be based.

> ... The actual license rate does not necessarily constitute a reasonably royalty. *See General Motors Corp. v. Blackmore*, 53 F.2d 725 (6th Cir.1939). Thus,

when the actual license rate is artificially low, a reasonable royalty may be set above that rate.

*Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 204 U.S.P.Q. 881, 66 A.L.R. Fed. 165, *cert. denied* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980).

Chisum entered into the license agreement with Chief in 1972 when the marketability of his machine was relatively uncertain. The reasonable royalty rate to redress an infringement must be based on the time period during which the infringement occurred. In 1984 when Machine No. 1 was built and used, the EZ Liner was a great success and leader in the industry. The contracted royalty rate of some twelve years prior is therefore of little probative value.

■ Title 35, United States Code, Section 284 states: "... The Court may increase the damages up to three times the amount found or assessed." The damages for the seven machines of the No. 2 type total ($16,584.00 × 7) $116,088.00, based upon the evidence of lost profits proved at trial. That amount will be doubled to a total award of $232,176.00 for infringement by the sale of those seven machines.

It is by now well settled that where a potential infringer has actual notice of another's patent rights he has an affirmative duty of due care [citations omitted]. That affirmative duty will normally entail the obtaining of competent legal advice of counsel before infringing or continuing to infringe ... The Court should always look at the totality of the circumstances [citations omitted].

*Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109, 231 U.S.P.Q. 185 (Fed. Cir.1986).

In November of 1983, Brewer had actual notice of the existence of the Chisum patent. At that time he redesigned the pull towers of his machine, accomplishing this in December of 1983. He did not seek competent legal advice as to Chisum's rights under the patent until he was served with notice of the infringement by Machine No. 1 in January of 1984. Brewer retained Warren Flackbert as patent counsel in Feb-

ruary of 1984, and Flackbert began studying the Chisum patent and prior art. Though Flackbert required four to five months to accomplish a complete analysis, Brewer was impatient, disseminating by word of mouth the availability of his Machine No. 2, and marketing it openly in May of 1984. Brewer relied on the incomplete, or informal, opinion of Flackbert that Machine No. 2 did not infringe the Chisum patent. The existence of Machine No. 2 was deliberately withheld from Chief during the period of settlement negotiations in regard to Machine No. 1, though Chief made it clear that it was concerned about Brewer's intentions in manufacturing other frame-straightening machines. The lost profits will however be doubled rather than tripled, since we find that Brewer's actions were willful, but not so egregious as to warrant trebling of the damages.

Lost profits will be awarded for the 61 machines of the No. 3 type sold by Brewco during 1984, 1985, and 1986, totaling $1,167,485.00. The plaintiffs may tender additional documentation concerning lost profits on machines sold and on hand for fiscal years 1987 and 1988, and the Court will take the matter of an additional award of damages under advisement. The lost profits due to Machine No. 3 infringement will not be increased insofar as sales of these machines began in late 1984, after Flackbert had completed his evaluation of the reissue patent and status of defendants' machines. Flackbert advised Brewer to commence production of Machine No. 3, as he found that the Machine No. 3 design did not infringe the reissue patent. Brewer relied upon advice of counsel in this regard, thus his production of Machine No. 3 and his sale of the Add–a–Tower units cannot be found to be egregious.

The sum of $5,480.00 will be awarded for lost profits due to Brewco's Add–a–Tower sales during 1986. The plaintiffs may tender additional documentation concerning lost profits due to Add–a–Tower units actually sold by Brewco during fiscal years 1987 and 1988. The Court will take the matter of an additional award of damages under advisement.

Title 35, United States Code, Section 284 provides:

Upon finding for the claimant the Court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonably royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court.

[19] Prejudgment interest will be awarded in this case insofar as it "should ordinarily be awarded". *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983); *Waite v. United States*, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931). The corporate bond rate established in evidence by the plaintiffs is appropriate. *See Devex Corp.*, supra. Prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion. *Underwater Devices, Inc. v. Morrison–Knudsen Co., Inc.*, 717 F.2d 1380, 219 U.S.P.Q. 569 (Fed.Cir.1983).

 Attorneys fees will not be awarded to the plaintiffs in this action. Although the award of attorneys fees is discretionary, the Court must first specifically find such exceptional circumstances as misconduct during litigation, vexatious, unjustified or frivolous lawsuit, etc. *See Bayer Aktiengesellschaft v. Duphar International Research B.V.*, 738 F.2d 1237, 222 U.S.P.Q. 649 (Fed.Cir.1984). The Court does not find such exceptional circumstances in this case.

For the reasons set forth above, and the Court being otherwise sufficiently advised, IT IS HEREBY ORDERED that:

1. The plaintiffs shall tender a proposed form of judgment.

2. The plaintiffs may tender additional documentation concerning lost profits for the years 1987 and 1988.

3. The defendants shall have twenty (20) days from the date of service of a copy of the proposed judgment and data on additional damages in which to file objections as to form.

On Motion To Amend Opinion

This matter is before the court on motion of the defendants, Brewco Sales and Manufacturing, Inc. ("Brewco") and Clarence W. Brewer ("Brewer"), for amendment of the court's Memorandum Opinion and Order entered February 1, 1989.

This opinion is intended to supplement and clarify our February 2, 1989 opinion. For the reasons stated below, the motion of the defendants for amendment of the earlier order will be denied.

Initially it should be noted that we held that the Chisum reissue patent is *not* a pioneer patent but that Chisum's advancements did constitute substantial steps in the frame-straightening art. (Mem. Op. at 18). The court also noted that claims 1, 33 and the dependent claims found in the reissue patent were before the Eighth Circuit Court of Appeals on a validity challenge and were found to be unobvious to a person of ordinary skill in the art at the time the invention was made. The validity of the Chisum patent is not in issue. (Mem. Op. at 18).

Defendants believe that the court incorrectly focused on the Chisum patent specifications and drawings in its analysis of Machine No. 3 rather than comparing Machine No. 3 to Claim 1.

*Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 228 U.S.P.Q. 90 (Fed.Cir.1985), held that in interpreting the claims in issue, a threshold inquiry, the specification is properly to be considered in ascertaining the true meaning of disputed claim language; however, particular limitations or embodiments appearing in the specification will not be read into the claims.

The defendants state themselves at page 5 of their memorandum in support of their motion to amend that "the claim language, of course, always being construed in the [sic] light of the teachings contained in the patent specification and drawings." (See also pp. 6–7 quoting from *U.S. v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 U.S.P.Q. 479, 482 (1966)).

 court found at page 24 of the Memorandum Opinion that the Chisum in-

vention was "a non-obvious combination of elements found in the prior art solving the problems of lack of versatility and extensive commitment of time which plagued the industry." Because this patent's genius is in the unity of the machine, an assessment of the way in which it operates as a whole is critical to the analysis. The defendants' argument that the court should not look to the patent's specification and drawings for comparison but should instead focus on each discrete element found in the claim is an attempt to dissect the claim beyond recognition. The court has been charged with, in effect, failing to see each tree for the forest, by refusing to focus on the way in which the Chisum and Brewer machines perform each function. The court has focused on each of the elements in the context of the whole. As noted in *Corning Glass Works v. Sumitomo Electric USA, Inc.*:

> "Element" ... has also been used to mean a series of limitations which, taken together, make up a component of the claimed invention. In the All Elements rule, "element" is used in the sense of a limitation of a claim.... An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component.... [citation omitted] ...

We have addressed in our opinion each element of the claim as we found it to exist in the defendants' machines.

With respect to Machine No. 2, we found literal infringement. The defendants assert that the "tower" does not elongate, urging that "tower" refers only to the cylindrical tube which must extend externally when it moves. The court rejected this argument which was advanced at trial. The "said tower" referred to in element d is the "at least one vertical pull tower means" claimed immediately above in element c. Element d states a means plus a corresponding function: "means to vertically elongate said tower." What element d requires is elongation of the vertical pull tower means which is accomplished when the energized cylinder forces the extensible rod downward. The defendants attempt to avoid literal infringement by limiting their

interpretation of tower elongation to external movement of the tower shell. This is too narrow a view. Elongation is a change in length. Length is "the extent or distance of something from beginning to end as measured in space." (See the *American Heritage Dictionary*, 2d College Ed.) It is misleading to focus on the shell alone when "said tower" refers to a "vertical pull tower means" whose intended result is chain tightening accomplished by elongation of or increased length in the vertical pull tower means.

With respect to Machine No. 3 and Add–A–Tower, the court addressed each element of the claim finding that the defendants' devices performed substantially the same function in substantially the same way to achieve the same result.

The defendants complain that in our analysis we compare certain components of Machine No. 3 and Add–A–Tower, such as pulleys and collars, to those found in the Chisum patent but which are not elements of Claim 1. The function-way-result analysis conducted by this court addressed what Claim 1 requires and nothing more. The defendants chose to utilize a similar pulley/collar system to that described in the Chisum patent. That fact emphasizes the similarity between the machines, but is not a factor in the function-way-result analysis. The Chisum result is accomplished by the defendants' devices. The function and way in which the result is achieved in the defendants' Machine No. 3 and Add–A–Tower are substantially the same as the function and way claimed in Claim 1. The function-way-result test was applied comparing those devices to each element of Claim 1 of the Chisum patent. The references to the operation of the devices with pulleys and collars illustrate the combination in action. It so happens that the defendants created a machine which is quite similar to Chisum's preferred embodiment of the machine with the various pulley and collar components; however, the case for infringement is made out with reference solely to the Claim 1 elements. The case of *Loctite v. Ultraseal, Ltd.*, 781

F.2d 861, 228 U.S.P.Q. 90 (Fed.Cir.1985), cited by the defendants does not state that it is error for a court to look to drawings and specification in its analysis and interpretation of patent claims. Rather, it states that a court may not read additional limitations gleaned from those drawings or the specification into a claim. This court has not read any additional limitations into Chisum's Claim 1.

The defendants state that the plaintiffs have not proved entitlement to an award of lost profits. The plaintiff proved through the presentation and discussion of its prospectus (Findings of Fact, para. 100–104) the demand for Chisum's machine, Chief's ability in production and marketing to meet the demand and detailed computations of lost profits. It was asserted that there were competitors but no acceptable noninfringing alternatives which would take a bite out of Chisum's profits. (Testimony of James Zana). In the absence of any evidence by the defendants at trial that such alternatives which are noninfringing and constitute an adequate substitute, the plaintiff's proof of his element stands uncontested.

To the extent that the statements made herein are explanatory or supplemental to our Memorandum Opinion and Order of February 1, 1989, this Memorandum Opinion and Order will be incorporated therein.

For the reasons stated above, and the court being otherwise sufficiently advised, IT IS HEREBY ORDERED AND ADJUDGED that the motion of the defendants, Brewco Sales and Manufacturing, Inc. and Clarence W. Brewer, for amendment of this court's order of February 1, 1989, is DENIED.

IT IS FURTHER ORDERED that the defendants shall file, within thirteen (13) days from the date of entry of this order, objections, if any, to the plaintiffs' tendered judgment of February 27, 1989.